**Dentic R. DAVIES, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 82-1668.**

District of Columbia Court of Appeals.

Submitted March 1, 1984.

Decided April 24, 1984.

---

John W. Sansing, Washington, D.C., appointed by this court, for appellant.

Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Michael W. Farrell, Thomas J. Tourish, Jr., Mark J. Biros, and Daniel S. Seikaly, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Before KERN, NEBEKER and FERREN,* Associate Judges.

NEBEKER, Associate Judge:

Appellant challenges his conviction of second-degree murder.[1] D.C.Code § 22–2403 (1981). On appeal, he contests (1) the denial of his motion to suppress a written statement, (2) the denial of his motion for a new trial based on withheld *Brady*[2] material, and (3) assertedly improper cross-examination of appellant by the prosecutor. We affirm.

I

On August 8, 1980, at approximately 10:30 p.m., Prince Shannon was sitting in front of 456 K Street, N.W., three houses from the scene of John Hughes' murder. Two men walked past him and then stopped to engage in a brief conversation. Shannon testified that he had seen appellant around the neighborhood on several occasions. This evening, appellant was carrying his shirt in his hand. Passing Shannon again, the two men walked into the yard at 462 K Street, Hughes' rooming house, just as Hughes and Mercer Simon were coming out of the house. Hughes and Simon talked in the yard, while appellant and his companion walked past them and into the rooming house.

Leaving Simon in the yard, Hughes followed them inside. Soon thereafter, Shannon heard a loud crash from inside the

---

\* *Associate Judge* FERREN concurs in the result.

1. Appellant was originally indicted, along with an accomplice, on charges of first-degree felony murder while armed, D.C.Code § 22–2401 (1981), and armed robbery, *id.* §§ 22–2901, –3202. He was acquitted of these charges and convicted of the lesser included offense of murder in the second degree. *Id.* § 22–2403.

2. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1964).

rooming house and saw Simon look into the building through a first floor window before running to a nearby telephone booth. Shannon then saw appellant run out of the house and down K Street. A single gunshot followed about a minute later, and appellant's companion emerged from the house holding a pistol. He too ran down K Street.

Mercer Simon was employed as the assistant resident manager of 462 K Street. He testified that shortly before 11:00 p.m., as he and Hughes came out of the rooming house and stood in the yard, two men walked past them into the building. Hughes went back into the rooming house to see what the two men wanted. Simon then heard "a lot of commotion" coming from within the house. Simon stepped into a pay telephone booth directly in front of the house and called the police. While in the telephone booth, and by looking through a first floor window, Simon saw Hughes struggling with two men. He then saw appellant run from the building, a single gunshot followed, and appellant's companion soon followed running out of the building gun in hand. Simon saw Hughes lying on the floor with a gunshot wound in his chest.

At the scene, the police recovered a shirt and a sawed-off rifle. In the shirt pocket was a picture of appellant and his girlfriend. The shirt and gun were turned over to the police by Kay Bangs, a rooming house resident. Miss Bangs was not located for trial, and did not testify.

Testifying on his own behalf, appellant gave a version of the events which was essentially consistent with the statement he made to the police on the day of his arrest. He claimed that he had just received an eviction notice for his apartment, and that Michael Jackson,[3] a recent acquaintance told him about a rooming house in the District that might be suitable for temporary lodgings. Appellant asked Jackson to take him there. Enroute, in Jackson's car, appellant noticed a sawed-off rifle on the front seat. Jackson asked appellant if he knew where the weapon could be traded for some drugs, and appellant said that he did not.

After parking the car in the 400 block of K Street, Jackson pointed out the rooming house to appellant. Appellant then walked into the building alone. There he attempted to find someone to talk with about renting a room. Unsuccessful, and on his way back down to the first floor, he saw Jackson fighting with another man. Fearing that his parole would be revoked if he became involved in any trouble, appellant ran from the building. He claimed to have not heard the gunshot or seen Jackson again.[4]

## II

■ At the hearing on appellant's motion to suppress, appellant urged that after he asserted his right to remain silent, this right was not "scrupulously honored" by the investigating detectives. *See Michigan v. Mosley*, 423 U.S. 96, 103–04, 96 S.Ct. 321, 326–27, 46 L.Ed.2d 313 (1975). A review, however, of the circumstances surrounding the taking of appellant's statement demonstrates that his "right to cut off questioning" was fully respected. *Id.*

Appellant and detectives Donald and Jackson agreed that on three occasions prior to appellant's actual arrest, the detectives had sought a statement from appellant concerning the murder. On each occasion he refused to give a statement, and the detectives respected his wishes. Appellant testified that he was familiar with his

---

3. Michael Jackson was indicted as appellant's codefendant (the gunman), but was ultimately tried after appellant on his own.

4. Appellant did acknowledge that at one point he called the detectives working on the case to tell them (pretending he was Jackson), that appellant had nothing to do with the shooting. Appellant claimed to have done this because of fear that he would be implicated in the shooting.

*Miranda*[5] rights from previous encounters with the police and that he understood those rights. Appellant also testified, in accord with the testimony of the detectives, that he understood the *Miranda* warnings given to him on the day of his arrest, and that he had voluntarily waived those rights. A signed waiver-of-rights form was introduced into evidence. However, contrary to the detectives testimony, appellant claimed that subsequent to this waiver he asserted his right to be silent and the detectives did not honor that assertion.

The trial court resolved this concrete credibility dispute, concerning appellant's purported assertion of his right to remain silent, in the government's favor. It found that appellant fully understood his rights, and gave his statement voluntarily in furtherance of his own interests. There is evidence to support the trial court's finding that appellant's rights were "scrupulously honored." *Michigan v. Mosley, supra;* D.C.Code § 17–305(a) (1981).

Appellant's next contention is that the trial court improperly denied his motion for a new trial, which was based on assertedly withheld *Brady* material. John Walker, also a tenant at 462 K Street and witness to portions of the incident, gave the police a statement which stated that he had seen two men struggling with Hughes. In this statement, he described the two men. The description of the gunman, *not appellant,* said the individual was white and not black as other witnesses related.[6] Mr. Walker did not testify at trial, and his statement was not given to appellant.

Appellant's theory appears to be that the different description of his companion by Walker could be used to impeach the credibility of other eyewitnesses. We disagree.

■ "Impeaching evidence is exculpatory and thus can be material to guilt or punishment within the meaning of *Brady.*"

*Lewis v. United States,* 408 A.2d 303, 307 (D.C.1979). However, the errant description here is of appellant's companion, not appellant. Further, Mr. Walker's description of the other assailant, that is appellant, jibes with descriptions given by Simon and Shannon. Most importantly, appellant openly acknowledged his presence at the rooming house. We fail to see what impeachment value the description could hold for appellant.

■ Where, as here, the trial court has determined that asserted *Brady* material would not have materially affected the verdict, the reviewing court is limited to a determination of whether that decision was reasonable. *United States v. Agurs,* 427 U.S. 97, 114, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976). An independent review is precluded. *Id.* It cannot be said that the trial court's ruling on the *Brady*-based new trial motion was unreasonable.

Appellant's final contention relates to the prosecutor's cross-examination of appellant concerning Ivory Virgil, a step-daughter of appellant's girl friend. The prosecution argued that Miss Virgil had lived at 462 K Street in August 1980, and then asked appellant if he had ever visited her there. Appellant denied any knowledge of the 462 K Street rooming house, as he had throughout the trial.

Counsel sought a mistrial arguing that the prosecutor had no independent evidence to support his assertions, and that the allegations shed an unsupported, prejudicial light on appellant's claim that the evening of the shooting was the first time he had been to the rooming house. The motion was denied.

■ The trial court held that the prosecutor had a good faith basis for the cross-examination, and that the narrow scope of his questions did not require the presenta-

---

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. It should be noted that Shannon and Simon described the gunman as a light-complected black man. In all other material respects, Walker's description did not vary from that of the other witnesses.

tion of independent evidence. The trial court nevertheless later instructed the jury that the attorneys' questions were not evidence, making specific reference to the Virgil inquiry. Under the circumstances, if there was any error, it was harmless. *See Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946).

*Affirmed.*