Edward FARLEY, Appellant,

v.

UNITED STATES, Appellee.

Nos. 92–CF–1039, 95–CO–488.

District of Columbia Court of Appeals.

Argued Aug. 12, 1998.

Decided Feb. 8, 2001.

W. Douglas Wham, Washington, DC, appointed by the court, for appellant.

Megan E. Hills, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Assistant United States Attorney, were on the brief, for appellee.

Before TERRY and RUIZ, Associate Judges, and KING, Senior Judge.[*]

KING, Senior Judge:

This case is before us for the second time, following remand of the record to the trial court. In 1992, Farley was convicted by a jury of various drug trafficking and weapons charges, as well as assault with a dangerous weapon.[1] Before trial, the trial court denied Farley's motion to compel discovery of some statements made to the police by Dennis Miles, a civilian witness. Farley noted a direct appeal, and he also appealed the trial court's denial of his motion under D.C.Code § 23–110 alleging ineffectiveness of counsel. Dennis Miles was a witness at the hearing on the § 23–110 motion, and during his testimony he referred to a complaint he had filed with the Civilian Complaint Review Board ("CCRB") regarding the conduct of some

of the police officers who participated in the effort to arrest Farley shortly after the offenses were committed. On appeal, Farley contended that the statements to the police and the CCRB complaint were Brady[2] material which had been impermissibly withheld. Appellant had not raised the Brady claim with respect to the CCRB complaint before the trial court and, thus, the trial court never had an opportunity to consider that claim.

When the case was first before us, we rejected all of Farley's contentions except for the Brady claim and remanded the record for further proceedings. See Farley v. United States, 694 A.2d 887 (D.C. 1997) (hereinafter "Farley I"). In remanding, we observed:

Unfortunately, the record was not sufficiently developed during the § 23–110 hearing to provide a sound basis for our evaluation of the government's obligation to disclose the CCRB complaint under Brady, the impact of the CCRB complaint on the lack of documentation on Miles' statements to the police, or the materiality of the undisclosed information in relation to other evidence adduced at trial. Therefore, we remand the record to the trial court for a hearing and determination of whether Miles' complaint to the CCRB was Brady material and, if so, whether had it been disclosed to the defense, there is a possibility that the result of the trial would have been undermined.

Id. at 890.

█ On remand, the trial judge conducted a hearing and, in a comprehensive

---

[*] Judge King was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on November 23, 1998.

1. Farley was convicted of distribution of cocaine while armed, see D.C.Code §§ 33–541(a)(1) (1998); 22–3202 (1996); possession of cocaine with intent to distribute while armed ("PWID"), see id.; assault with a dangerous weapon ("ADW"), see D.C.Code § 22–502; possession of a firearm during a crime of violence or dangerous offense ("PFCV"), see D.C.Code § 22–3204(b); and carrying a

pistol without a license ("CPWL"), see D.C.Code § 22–3204(a). He was sentenced to concurrent sentences of seven years to life imprisonment with a five-year mandatory minimum for the distribution and PWID convictions; a consecutive term of forty months to ten years for the ADW conviction; a consecutive term of one year for the CPWL conviction; and a concurrent term of five to fifteen years for the PFCV conviction.

2. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Memorandum on Remand, ruled that the CCRB complaint should have been provided to Farley under the *Brady* doctrine. However, the trial judge concluded, quoting *Kyles v. Whitley,* 514 U.S. 419, 441, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), that "disclosure of the suppressed evidence to competent counsel would [not] have made a different result reasonably probable." The case is now back before us on the *Brady* issue. We affirm.[3]

## I.

While there is a serious question in our mind whether the existence of Dennis Miles' complaint to the CCRB was sufficiently known to the government at the time of trial to trigger a disclosure obligation on its part pursuant to *Brady,* we will assume for the sake of argument that the information should have been made known to the defense.[4] Nonetheless, we hold that the trial court did not err in concluding that disclosure of the material in question "would [not] have made a different result reasonably probable." *Kyles, supra,* 514 U.S. at 441, 115 S.Ct. 1555.

## II.

The facts relevant to the *Brady* issue are summarized in our first opinion. *See Farley I, supra,* 694 A.2d at 888. The substance of Miles' complaint was that he was mistreated by some police officers after they entered his apartment in pursuit of a drug seller who had assaulted an undercover police officer with a pistol. It is conceded that the only potential use of the undisclosed material would have been for impeachment to show possible bias on the part of the officers who testified at trial. Farley maintains that the identifying officers, even though they were not the subject of the complaint to the CCRB, would have been motivated to tailor their testimony in order to produce a perpetrator (presumably anyone would do) in order to justify the police action with respect to Miles. This argument is made even though there has been no showing that the officers knew, when they testified, that the complaint had been made against the other officers. In assessing the impact this material would have had on the outcome of the trial, had it been available, the trial judge observed:

> While constituting Brady material, the disclosure of this material "*would [not] have made a different result reasonably probable.*" *Kyles v. Whitely [sic],* 514 U.S. 419, 441, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). First, the undersigned, who was on "the spot," is completely confident that whatever bias that might have been shown, on the part of the police in general or the identifying witnesses in particular, such bias would not have undermined the force of the police officers' identifications and the strong corroborating evidence provided by the items identifying Farley found in the coat worn by the fleeing suspect. Second, in his tape recorded interview, Miles stated that when he first saw the coat, it was being carried out of his kitchen. While not completely consistent with the testimony of police officers, it undercuts Miles' statements in his CCRB complaint that the coat was brought into his apartment from the out-

---

3. Farley also argues that the trial court erred in refusing to give a missing witness instruction regarding Miles and in concluding, on remand, that disclosure of the *Brady* material would not have influenced him to change that ruling. We are satisfied that the trial court correctly concluded that "the peculiar availability of Miles to the government ... was not shown." *See Ray v. United States,* 616 A.2d 333, 334 (D.C.1992) (detailing the legal principles governing the decision whether to give a missing witness instruction). The record reflects that the government attempted, unsuccessfully, to subpoena Miles for trial. Meanwhile, appellant's trial counsel was given Miles' name and address, and when trial counsel attempted to contact Miles, Farley's brother answered the door of Miles' apartment.

4. *Cf. Cox v. District of Columbia,* 821 F.Supp. 1 (D.D.C.1993), *aff' d,* 309 U.S.App. D.C. 219, 40 F.3d 475 (1994).

side and is fully consistent with the government's over-all theory of the case. In this court's judgment, *there is no reason to lack confidence in the outcome of Farley's trial.*

(alteration in original) (emphasis added). In so ruling, the trial judge applied the proper standards in his analysis.

The controlling cases are clear on that point. For example, we have said that when *Brady* information has not been timely disclosed, reversal "is warranted *only* where there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Edelen v. United States,* 627 A.2d 968, 971 (D.C.1993) (emphasis added). Further, a " 'reasonable probability' of a different result is ... shown when the government's evidentiary suppression 'undermines ˙confidence in the outcome of the trial.' " *Kyles, supra,* 514 U.S. at 434, 115 S.Ct. 1555 (quoting *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). As the italicized passages in the trial judge's ruling quoted above make clear, the judge was fully aware of the controlling standards.

█ Nor is it accurate to say that the trial judge applied a sufficiency of the evidence standard. Rather, fully cognizant of the evidence that had been presented at trial from his perch on "the spot" and being aware of the effect of that evidence on the jury, the trial judge made the judgment that there was "no reason to lack confidence in the outcome" of the trial because the undisclosed material would have had an insignificant impact. A wit-ness's demeanor, the certainty or uncertainty of an identification by a witness, or the physical characteristics of the trial participants which a jury or a judge observes without remark, are all factors that the trial judge who was "on the spot" absorbs and takes into account when judging whether the outcome of the trial was compromised by the absence of certain evidence. Under our case law, our review of the ruling of the trial court on this issue "is limited to a determination of whether that decision was reasonable." *Davies v. United States,* 476 A.2d 658, 661 (D.C. 1984).[5]

There is a question, however, as pointed out by Judge Ruiz, whether the standard set forth in *Davies,* and its progeny, is the correct standard to be followed by a reviewing court considering the effect of withheld evidence on the outcome of a trial. As Judge Ruiz observes, since *Brady* was decided, the Supreme Court, without expressly holding what standard should govern, has in some cases conducted an independent review of the evidence, giving little, if any, deference to the trial court's assessment.[6] The question of which standard to apply was not addressed by the parties in their supplemental briefs—indeed, to the extent the standard was discussed at all, it was assumed that the standard was the one set forth in our cases, *i.e.,* our review "is limited to a determination of whether that decision was reasonable ... An independent review is precluded." *Davies, supra,* 476 A.2d at 661. We will not attempt to resolve that

---

5. *Accord McCoy v. United States,* 760 A.2d 164, 184 (D.C.2000); *Sterling v. United States,* 691 A.2d 126, 134 (D.C.1997); *Matthews v. United States,* 629 A.2d 1185, 1199 (D.C. 1993); *Brooks v. United States,* 536 A.2d 1091, 1097 (D.C.1988); *Derrington v. United States,* 488 A.2d 1314, 1339 (D.C.1985). The *Davies* court relied on an early *Brady* case, *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), where the Supreme Court affirmed the trial judge's assessment that the withheld material would not have changed the result because it was "satisfied that [the trial judge's] firsthand appraisal of the record was thorough and entirely reasonable...." *Id.* at 114, 96 S.Ct. 2392.

6. *See generally Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Wood v. Bartholomew,* 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995); *Kyles, supra,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490; *Bagley, supra,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481.

issue in this appeal,[7] however, because we are satisfied that under either standard the withheld material "would [not] have made a different result reasonably probable." *Kyles, supra,* 514 U.S. at 441, 115 S.Ct. 1555.

## III.

■ At bottom, this case is an identification case which, because of the vagaries of that kind of proof, should always give us pause when assessing the impact of evidence that the jury should have heard, but did not. But even when we subject what was presented here, and what was not presented, to the most rigorous scrutiny, we arrive at the same result as the trial judge. That is so because this is no ordinary identification case.

The incident leading to the offenses charged in this case began more than nine years ago with three undercover police officers going to the 700 block of Langston Terrace, N.E., to make a narcotics purchase during the evening of January 18, 1992. Officer Cheryl Tillman entered a courtyard while Officers Cornell Johnson and Donnita Giles remained nearby. Tillman testified that she saw three men, one of whom she later identified as appellant Edward Farley, emerge from 732 Langston Terrace. She described the man as being heavily built, with facial hair. He was wearing a black baseball cap with a white X on it, black pants, and a black coat with fur around the collar.

The two conversed and Tillman asked the man (hereafter "the seller") if he had a twenty-dollar rock of crack cocaine to sell. The seller then asked Tillman whether she was a police officer, and she replied that she was not. He asked her whether she was wearing a wire or a gun, and she again replied no. With Tillman's permission, the seller then searched her person. "He searched me ... around my waist, between my legs, and up around my back." The seller then produced a brown medicine bottle from which he gave Tillman a rock in return for eighteen dollars. After the seller took the money, he announced that he was the police and that she was under arrest. The seller then placed a gun against Tillman's head and demanded that she lie down on the ground. She refused and the seller grabbed her clothes and continued to demand that she lie down on the ground.

At this point, the other two officers stepped in, identified themselves as police officers and told the seller to drop his weapon. The seller then turned toward Officers Giles and Johnson with his pistol in hand. At that point, a single shot was fired by someone else in the courtyard. This prompted Officer Giles to fire her weapon at the seller. None of the shots took effect, but the seller released Tillman and, with Officer Johnson in pursuit, ran back into 732 Langston Terrace, slamming the door behind him. In his wake, the gun and the money received from Tillman were either dropped or discarded on the ground, where they were later recovered by police officers and identified by Tillman. Johnson described the seller "as a heavyset black male wearing ... a dark-colored hat with an X on it, a dark-colored coat with fur lining by the hood, and some dark colored jeans and a goatee."

The officers stood outside the apartment door while they waited for backup which

---

7. It is worth noting that, except for *Bagley, supra,* (which does not, in our view, reject the *Agurs* deferential standard), all of the Supreme Court cases cited by Judge Ruiz in support of the independent review standard, *supra* note 6, were before the Court on federal *habeas* review. Therefore, the determination of the impact the asserted *Brady* material had upon the outcome was made by a judge other than the judge who conducted the trial. In contrast, in *Davies, supra,* and in all of our cases applying the deference standard, *supra* note 5, and in *Agurs, supra,* the judge making the impact determination was the same judge who presided over the trial. We need not decide whether this distinction is determinative; however, a case can be made that more deference is appropriate in the latter circumstance.

arrived approximately one minute later. While the officers were waiting, they heard a banging noise from inside, followed by a loud crashing sound and then silence. When the backup team arrived, the officers entered the premises; the seller was not there. They discovered that a window in the kitchen was pushed out and was lying on the ground. Other than the door through which the officers gained entrance and the kitchen window, there was no other exit. According to the testimony of the officers, the tenant (Dennis Miles) was in the bedroom when they entered. Also, according to the testimony of the officers, a dark baseball cap with a white X, a brown medicine bottle containing twenty-three ziplock bags of cocaine, and a coat with a fur hood were found in the apartment. All of these items were identified by Officer Tillman as being the same as those possessed by the seller during their encounter in the courtyard. The coat contained personal papers belonging to Farley including a District of Columbia Department of Corrections property inventory receipt. Finally, Officers Tillman, Giles, and Johnson made in-court identifications of Farley as the man they encountered in the courtyard.

To summarize: It is undisputed that someone sold crack cocaine to Officer Tillman, that the seller was heavily built, that at some point the seller pulled a gun, roughed up Officer Tillman, and when confronted by the other two officers, ran into Miles' apartment. Although the trial record does not provide a clear indication, it is fair to infer that Farley is heavily built [8] and that both the judge and the jury were

able to observe his physical characteristics as he sat in the courtroom during the trial. Further, in subsequent proceedings, Miles, who is a quadriplegic, testified that he had been in his bedroom and that someone—he did not see who—ran into his apartment and exited from the kitchen after breaking out the window. This testimony corroborates the testimony of the officers that Miles was in the bedroom when they entered the apartment moments after the seller exited by the kitchen window. Miles also testified that he had known Farley for thirty-nine years and that Farley, and some of his family members, frequented Miles' apartment.[9]

It is also undisputed that a black baseball cap and a brown medicine bottle were recovered inside Miles' apartment and that those two items were identified by the three undercover officers as being the same as those possessed by the seller. Moreover, the cocaine found in the bottle and the cocaine sold to Officer Tillman were nearly identical in purity (83% versus 85%). All three undercover officers identified Farley as the seller and assailant. Finally, the fur-hooded coat, identified by all three officers as the coat worn by the seller, and which contained personal papers belonging to Farley, was found either in Miles' apartment along with the baseball cap with the white X and the medicine bottle (according to the police testimony), in Miles' kitchen (according to one version given by Miles), or outside the apartment (according to another version by Miles). It is undisputed that the coat belonged to Farley.[10]

8. Although not conclusive on this point, the affidavit in support of the arrest warrant, which was prepared several weeks after the incident, states that Farley is 6' 2" and weighs 240 pounds. In his statements complaining about his mistreatment by the police, Miles says that the police officers referred to the seller as the "fat guy."

9. Although none of this testimony by Miles was heard by the jury, it almost certainly would have been if Miles' complaints of police misconduct had been aired at trial. There-

fore, it should be taken into account when weighing the effect of non-disclosure on the outcome of the trial.

10. In his original D.C.Code § 23–110 proceeding, Farley contended that trial counsel's performance was constitutionally ineffective because he failed to present evidence to support Farley's claim that the coat had been stolen from him earlier on the day of the incident. The trial judge, disbelieving the witnesses called at the hearing, rejected that contention, characterizing the "stolen coat"

■ In short, the evidence presented was overwhelming. The trial judge made the same assessment,[11] remarking that he remembered the trial "very, very well" and he recalled that the evidence against Farley was "very strong," "very powerful and convincing." Farley, however, casts doubt on the strength of the identification because the officers did not select Farley's photograph during one of the photo array sessions. That issue was thoroughly aired at trial and, as discussed below, we are satisfied that the in-court identifications by the officers were not undercut due to that circumstance.

The photo identification procedures employed were as follows. After Farley's personal papers were found in the coat recovered at the apartment, the sergeant supervising the undercover officers assembled an array containing black and white photos. None of the officers were able to identify the photo of Farley. A few days later James Flynn, an investigator for the unit involved, was assigned to the case. He examined the photo array, which he found included photos that had been taken in the 1970's and 1980's. Investigator Flynn characterized the quality of the photos as being "[p]oor, very poor." There is no record evidence challenging that characterization. However, the jury and judge were able to make their own assessment on that point because the black and white photo array was mounted on an exhibit and displayed during the trial.

Investigator Flynn then obtained an array of color photos which included a photo of Farley taken in either 1990 or 1991, a year or so before the incident. This array was mounted on the same exhibit as the black and white photos and displayed to the jury. The jury was also informed which photo, in each array, was the photo of Farley.

Investigator Flynn testified that the color array was shown to each of the undercover officers separately over a ten-day period following his assignment to the case. Officer Tillman, who testified at trial that she got a good look at the seller's face because the area was well lit, positively identified the photo of Farley. She also identified Farley in court. With respect to Officer Giles' viewing of the color array, Flynn testified that she went through the photos one at a time and when she reached Farley's photo she said: "This is him. I was no more than ten feet from him. That's him." She also identified Farley in court. Giles testified that the lighting at the scene was "clear," that she got a good look at Farley's face and that there was nothing to obstruct her view of him. Finally, Officer Johnson could not decide between the photo of Farley and another man in the color array;[12] however, he testified that the scene was "well lit" and he unhesitatingly identified Farley in court.

Based on the foregoing, we are satisfied that the identification evidence, by itself, was very strong. It consisted of three in-court identifications by experienced police officers who, because of the very nature of the type of police activity in which they were engaged, are trained to be observant of a seller's physical characterization so that a later identification can be made.[13]

defense as "bordering on the frivolous." In our first opinion, we affirmed that ruling. *See Farley I, supra,* 694 A.2d at 888 n. 2.

11. Section 23–110 hearing, *supra* note 10, held in April 1995.

12. That uncertainty was apparently prompted by the amount of facial hair of the subjects depicted in the two photos. Officer Johnson testified that the fact the seller wore a goatee stood out in his mind when he was shown the color photo array. The photos are not part of the record on appeal; however, during cross-examination of Officer Johnson, Farley's counsel asserted that Farley was not wearing a goatee in the color photo. Although we are unable to see for ourselves whether or not Farley wore facial hair in the photo, both the jury and the judge were able to do so.

13. The record does not tell us whether the officers were of the same race as the seller, although that fact would have been apparent to the jury and the judge. Therefore, we cannot determine whether these identifica-

The circumstance surrounding the non-identification at the first photo array was examined at length at trial; the photos used were displayed for the jury and judge to see, and both the jury's verdict and the trial judge's assessment of the impact of that evidence demonstrate that the identification testimony of the officers was credible. Although we are unable to confirm from the record whether Farley—the man sitting in the courtroom—was heavily built and in other ways fit the description provided by the officers moments after the incident, it is unlikely that the jury would have convicted, or the trial judge would have made the assessment he did, if that were not the case. Finally, the strength of the identification evidence is bolstered by the clear motivation of the officers to make an accurate identification of the drug seller who had pulled a gun on, and physically assaulted, a police officer. It defies common sense to suggest that the officers would falsify their testimony in these circumstances—their motivation was to identify correctly the person who had committed those acts, not just anyone.

As we have said, we are satisfied that the identification evidence was very strong. We do not have to rely upon the identification evidence, however, because the verdict in this case does not rest solely on that evidence. It is supported by the fact that the coat worn by the seller, which was identified as such at the scene by the three undercover officers, was recovered either in or just outside Miles' apartment. It is undisputed that the coat contained personal papers belonging to Farley, and there was no evidence that the coat did not belong to him. Moreover, it is undisputed that the seller's hat and medicine bottle were recovered from the apartment and there was evidence linking the drugs found in the bottle to the drugs sold to Officer Tillman. All of this evidence, taken together, in the words of the trial judge, was "very powerful and convincing." Finally,

it was later determined that Miles, who resided in the apartment, was a long time friend of Farley and that Farley was frequently in the apartment.

On remand, the trial judge was asked to weigh this "very powerful and convincing" evidence against the fact that Miles filed a formal complaint that he had been mistreated by some of the officers who entered his apartment that evening. None of the officers who testified were implicated in this complaint. Although there is no evidence that the undercover officers knew that Miles had filed a complaint against other officers when they made the color photo and in-court identifications, Farley argues that this evidence may have given the police who testified reason to tailor their testimony in order to justify the tactics of the officers on the scene by producing the perpetrator.

We agree with some of the implications of Farley's argument because, as stated above, to the extent the officers had any motive beyond their usual interest in law enforcement, it was in their interest to identify the real perpetrator, not just anyone. One of the identifying officers had just been roughly treated by a drug seller who had leveled a pistol on her. A second officer had been so threatened by the drug seller that she was compelled to defend herself by firing her own weapon at him. The third officer observed all of these events. In these circumstances, the officers would be far more motivated to identify the actual perpetrator than they would be motivated to identify just anyone in order to justify the actions of other police officers, as Farley suggests. In sum, we are confident that the withholding of the asserted *Brady* material, does not "undermine[ ] confidence in the outcome of the trial." *Bagley, supra,* 473 U.S. at 678, 105 S.Ct. 3375.

## IV.

For the foregoing reasons, whether we defer to the judgment of the trial judge so

tions were, or were not, cross-racial. *See* Sheri Lynn Johnson, *Cross Racial Identifica-*

*tion Errors In Criminal Cases,* 69 Cornell L.Rev. 934 (1984).

long as that judgment is reasonable, or whether we are required to independently assess the record, we are satisfied that the trial court correctly ruled in rejecting this claim.

*Affirmed.*

RUIZ, Associate Judge, dissenting:

I disagree with the majority's conclusion that the trial court did not err in deciding that non-disclosure of a complaint filed with the Citizens' Complaint Review Board and a statement given to the police itself concerning serious misconduct and physical abuse by the officers involved in the sting operation and during its immediate aftermath, was not a *Brady*[1] violation because disclosure "would not have made a different result reasonably probable." *See Kyles v. Whitley,* 514 U.S. 419, 441, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). First, I disagree with the majority's reasoning that a deferential standard, rather than a rigorous independent review, may be permissible; second, in assessing the materiality of the withheld documents, the majority's analysis does not apply the proper prejudice standard, whether the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the outcome," *Strickler v. Greene,* 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (quoting *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555), to the evidence in this case. As I conclude that the documents were in the possession of the government for *Brady* purposes (a point the majority assumes, but does not decide), I would reverse Farley's conviction.[2]

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. Because I would reverse on the *Brady* issue, I need not reach the other issue left pending in our original review of this appeal, whether the trial court erred in refusing to give a missing witness instruction. As the purported missing witness at trial, Dennis Miles, subsequently testified at the § 23–110 hearing and at the hearing on remand, I assume he

## I.

## Standard of Review

An appellate court reviewing a determination whether there has been a *Brady* violation conducts an independent, *de novo* review of the withheld evidence in the context of the evidence at trial. No other conclusion can be reached from the Supreme Court's opinions in *Kyles, Bagley,*[3] *Wood,*[4] or *Strickler,* all of which exhaustively review the evidence, without expressing a deferential standard or, in fact, affording any deference to the lower courts' determinations. *See, e.g., Kyles,* 514 U.S. at 455, 115 S.Ct. 1555 ("[M]y independent review of the case left me with the same degree of doubt about the petitioner's guilt") (Stevens, J., concurring, joined by Justices Ginsburg and Breyer). This is consistent with the origin of the *Brady* materiality test, which is derived from the prejudice prong for ineffective assistance of counsel—an inquiry which the Court has held presents a mixed question of law and fact. *See Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *cited in Bagley, supra* note 3, 473 U.S. at 682, 105 S.Ct. 3375. Although the majority opinion states it is applying an independent review in this case, it also suggests, relying on *Davies v. United States,* 476 A.2d 658 (D.C.1984), that a standard deferential to the trial court's ruling may be permissible, even if it limits our review "to a determination of whether that decision is reasonable," and precludes an independent review. *Id.* at 661.[5] Notwithstanding the

would have been similarly available if he had been called at trial.

3. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

4. *Wood v. Bartholomew,* 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995).

5. A deferential standard similar to that in *Davies* is applied. *Sterling v. United States,* 691 A.2d 126, 134 (D.C.1997); *Matthews v.*

rule in *M.A.P. v. Ryan*, 285 A.2d 310 (D.C. 1971), we must conform our law to controlling Supreme Court precedent on constitutional matters.[6] Therefore, I turn to an independent review of the *Brady* issue presented by this appeal.

## II.

### Statement of the Case

We consider this appeal for a second time, after having remanded the record to the trial court for a hearing and determination whether a witness's complaint to the Citizens Complaint Review Board ("CCRB") was *Brady* material and, if so, whether had it been disclosed to the defense, there is a reasonable probability that the outcome of the trial would have been different. *See Farley v. United States*, 694 A.2d 887, 890 (D.C.1997).

The facts relevant to the *Brady* issue are summarized in our first opinion in this appeal in which we remanded the record to the trial court. *See id.* at 888. Noting that the government's obligation to disclose information under *Brady* extends

"not only to the prosecutor, but the Government as a whole, including its investigative agencies," *id.* at 889 (quoting *Martinez v. Wainwright*, 621 F.2d 184, 187 n. 4 (5th Cir.1980) and *United States v. Bryant*, 142 U.S.App. D.C. 132, 140, 439 F.2d 642, 650 (1971)), we concluded that the record was too sparse to determine whether the exculpatory information Farley claimed the government was obligated to disclose was *Brady* material. Specifically, we questioned whether a complaint filed by Dennis Miles with the CCRB was in the possession of the government, or should have been imputed to it for *Brady* purposes, as the regulations provided for notice to at least the police officer identified in the complaint (and perhaps also to the United State Attorney's Office, depending on whether the CCRB finds a "probability" that there has been criminal misconduct). *See Farley*, 694 A.2d at 890 & nn. 12 & 13. Miles' CCRB complaint, which was made ten days after the drug buy-bust operation resulting in Farley's conviction,[7] detailed abusive treatment and

---

*United States*, 629 A.2d 1185, 1199 (D.C. 1993); and *Derrington v. United States*, 488 A.2d 1314, 1339 (D.C.1985). There may well be others.

**6.** The majority suggests that the Supreme Court's independent review may apply only in the context of habeas petitions, and not in cases such as ours where the *Brady* ruling on review was made by the trial judge. A number of federal appellate courts, on direct appeal from federal district courts, apply *de novo* review to *Brady* rulings, however. *See United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir.1999) ("If a new trial motion is based on an alleged *Brady* violation, ... we review the district court's ruling *de novo*."); *United States v. Amlani*, 111 F.3d 705, 712 (9th Cir.1997) ("We review *de novo* allegations of *Brady* violations."); *United States v. Joseph*, 996 F.2d 36, 39 (3rd Cir.1993) ("[W]hen a *Brady* violation is alleged issues of law and fact usually are presented. In that circumstance, we review the district court's legal conclusions on a *de novo* basis and its factual findings under the clearly erroneous standard."); *United States v. Phillip*, 948 F.2d 241, 250 (6th Cir.1991) ("Because materiality under *Brady* presents a mixed question of law and fact, ... our standard of review is *de*

*novo*."); *United States v. Rivalta*, 925 F.2d 596, 598 (2nd Cir.1991) (noting that "the materiality of an alleged *Brady* violation [is] not, as the government contends, ... a purely factual issue, but ... a mixed question of law and fact ... We therefore reject the government's suggestion that we employ a 'clearly erroneous' standard of review"). *But see United States v. Silva*, 71 F.3d 667, 670 (7th Cir.1995) (noting that because trial judge "is best positioned" to determine effect of a particular piece of evidence "in light of full context of the weight and credibility of all evidence," appellate review of district court's denial of a *Brady* claim on ground of materiality is for "abuse of discretion.")

**7.** The government points out that Miles's complaint was filed the day after Farley was arrested and suggests that the timing of the complaint casts doubt on Miles's motive for his filing with the CCRB. There is no indication in the record on remand raising this suspicion. The trial court made no findings of facts in this regard or with respect to Miles's credibility. Farley had subpoenaed Miles for the remand hearing and Miles was present; neither the trial court nor the government chose to question Miles.

threats by police officers against Miles, a paraplegic, after the police chased Farley into and through Miles' apartment the night of the drug buy-bust and, again, when they interviewed him several days later. The CCRB complaint described several officers and identified one, Officer Zerega, by name.

On remand, the trial court held a hearing and determined that the government had failed to disclose three documents which, in the view of the trial court, potentially were *Brady* material: "(1) Miles'[s] two-page statement of January 19, 1992, given to Detective Thomas A. Page [on the night of the incident],[8] (2) Miles'[s] January 29, 1992, CCRB [C]omplaint, and (3) a tape recording of an interview Miles had with police officers on January 30, 1992, in connection with their investigation of his CCRB [C]omplaint."[9] The trial court stated that "[e]ach statement, if believed, discloses police misconduct, possibly including misconduct on the part of the police officers who identified Farley at this trial." The reports, the trial court continued, could have "provided a good faith basis" for cross examination of the police officers for bias which, if successful, "might have impugned these witnesses' credibility, an attribute upon which their identification and other testimony depend-

ed." Nonetheless, the trial court concluded, quoting *Kyles*, 514 U.S. at 441, 115 S.Ct. 1555, that "disclosure of this material 'would [not] have made a different result reasonably probable.'" The trial court based its conclusion from having been "on the spot" and having confidence that "whatever bias that might have been shown, on the part of the police in general or the identifying witnesses in particular, such bias would not have undermined the force of the police officers' identifications and the strong corroborating evidence."[10] The trial court also explained that one of Miles's statements in his tape-recorded interview with the police concerning his CCRB complaint, "[w]hile not completely consistent with the testimony of police officers," was not consistent with Miles's statement in his CCRB complaint concerning the place from which he saw the police recover the suspect's coat in Miles's apartment.[11]

### III.

### Analysis

I agree with the trial court's assessment that the three documents it identified and considered were in the possession of the government, if material, should have been disclosed to the defense under *Brady*.[12]

---

8. One of the reasons that prompted us to remand in our first opinion in this appeal is that "it is anomalous that there is no evidence in the record (or even outside the record as revealed by the government at oral argument) of any documentation whatsoever of Dennis Miles'[s] statements to the police." *Farley*, 694 A.2d at 889. Apparently, upon our calling attention to this anomaly, the government searched and was able to find such written documentation on remand.

9. According to the transcript of the hearing on remand, the taped interview was not with the police, as the trial court noted, but with a CCRB officer.

10. The corroborating evidence consisted of a coat that was found by the police in Miles's apartment, and inferentially, could have been worn and shed by the fleeing suspect as he ran through Miles's apartment. When recovered, the coat was found to contain papers with Farley's name and a medicine bottle

containing 23 ziplock bags of cocaine. The police testified at trial that the coat had been found in the kitchen of Miles's apartment through which they chased the suspect. Farley's explanation at trial was that the coat was his, but had been stolen earlier in the day and the drugs subsequently put in the pocket by the thief. Farley, his brother and girlfriend testified that Farley's coat had been stolen.

11. The inconsistency noted by the trial court is that in the CCRB complaint and in his testimony at the § 23–110 hearing in 1995, Miles testified that the jacket was brought into his apartment "from the outside." In his tape-recorded interview with a CCRB officer, Miles stated that the coat was being carried "from his kitchen." See *infra* note 20.

12. As noted, the majority does not reach this issue because it concludes that the undisclosed documents were not material under *Brady*.

Although the trial court's "on the spot" views of the evidence in a case are not something we can usually better from our appellate perch, the determination whether the required prejudice has been shown is ultimately a conclusion of law that constitutional error has occurred. *See Kyles,* 514 U.S. at 422, 115 S.Ct. 1555. As already discussed, that is a conclusion an appellate court can reach only after conducting a rigorous and independent review of the withheld material in the context of the trial. After conducting such a review of the record in this case, I conclude that because the disclosure of the withheld materials would have made a different result reasonably probable, or, put another way, that the nondisclosure undermines confidence in the verdict, there has been a *Brady* violation and reversal is required. Once a reviewing court has found *Brady* constitutional error, there is no further harmless error review. *See id.* at 435, 115 S.Ct. 1555.

### A. Were the undisclosed documents in the possession of the government?

When we remanded the record, we had thought that the main—and potentially difficult—question was whether Miles' complaint to the CCRB should be deemed to be in the "possession" of the government for *Brady* purposes. *See Farley,* 694 A.2d at 890. As it turns out, we need not decide the question we previewed in our remand order, for as is clear from documents newly produced for the record on remand, the government was in fact on notice early on of Miles' complaint of police misconduct. On the night of the incident, Miles gave a statement to Detective Thomas A. Page at the police's Fifth District in which he claimed that an officer "hit me [on] my

head, the Officer, he stomped my head, one kicked me in my head and they beat me in my stomach, they kicked me in my head." [13] Further, on February 3, 1992 (two months before the pretrial motions hearing and three months before Farley's trial), Alfreda Davis Porter, Executive Director of the CCRB, wrote to Officer Zerega enclosing a copy of Miles' CCRB complaint, which identified Officer Zerega by name. *See* 6A DCMR § 2105.3; *Farley,* 694 A.2d at 890 & n. 12 (noting that regulations require CCRB to transmit copy of non-frivolous complaints "to the subject police officer"). We noted the importance of what the police knew because "pursuant to *Kyles,* the government is responsible for knowing what the police know." *Farley,* 694 A.2d at 890. Although it was Officer Zerega, as the target of the investigation, and not the police department, who received the copy of Miles's CCRB complaint, in this case the government had actual notice of Miles's complaint of police misconduct from the statement he gave to Detective Page the night of the incident. Based on that information, the government had a "duty to search." *See United States v. Brooks,* 296 U.S.App. D.C. 219, 222, 966 F.2d 1500, 1503 (1992) (noting that a duty to search may flow from the "nature of the files" or "[w]here the file's link to the case is less clear, the court must also consider whether there was enough of a prospect of exculpatory materials to warrant a search"); *Joseph,* 996 F.2d at 39 ("[w]e consider whether the prosecutor knew or should have known of the *[Brady]* materials even though they have developed in another case."); *United States v. Deutsch,* 475 F.2d 55, 57 (5th Cir.1973) (requiring disclosure of possible adverse information in the personnel file of a post office employee who testified that defendants sought to bribe him). Given the nature of

---

**13.** According to the trial court's Remand Memorandum, Miles' statement to the police consists of two pages; only one page appears in the record on appeal. In the statement, which is signed by Detective Page, Miles describes that when he heard someone say "Police" at his door, at his request his girlfriend

opened the door, and the police rushed in and asked whether Miles had seen the suspect ("where did the big fat guy go"). Miles testified that "[w]hen I said [']what guy[?'] that's when the Police grabbed me and started punching me."

Miles's complaint to Detective Page, the government's failure to locate the CCRB complaint and the ensuing tape-recorded interview by the CCRB officer amounted to "failure to turn over an easily turned rock." *Brooks*, 296 U.S.App. D.C. at 222, 966 F.2d at 1503.[14] It is the government's responsibility to establish such procedures as may be necessary to identify and preserve *Brady* material. *See Bryant*, 142 U.S.App. D.C. at 142, 439 F.2d at 652.[15]

The record on remand also includes the affidavit of David E. Mills, the Assistant United States Attorney who prosecuted Farley's trial, in which he states that "he was [not] informed that a CCRB complaint had been filed against one of my officer witnesses" and that "I do not recall being told during my tenure at the U.S. Attorney's Office that any of the witnesses in [Farley's] case had been mistreated by the police." As the Supreme Court has made clear, however, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555. The reason for placing this burden on the individual prosecutor, as the Court explained, is that:

> [T]he prosecutor has the means to discharge the government's *Brady* responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils

down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.

*Id.* at 438, 115 S.Ct. 1555.

The record on remand also contains the affidavit of Sherri L. Berthrong, Chief of the Grand Jury Intake Section of the Office of the United States Attorney, in which she states that she received Miles' complaint from the CCRB on July 13, 1992. *See* 6A DCMR § 2105.7; *Farley*, 694 A.2d at 890 n. 13 (noting that where the CCRB finds "any probability" of criminal misconduct, "the Board shall refer the complaint to the United States Attorney for the District of Columbia."). According to the affidavit, Ms. Berthrong sent the complaint to the Metropolitan Police Department for investigation. Based upon the MPD's investigation, the United States Attorney's office "declined" to prosecute on October 26, 1992. Farley was tried in May 1992, but was not sentenced until August of that year. Although the United States Attorney's Office did not have copy of the CCRB complaint directed to its attention until after trial, it undisputedly had received it prior to Farley's sentencing. As late as the first oral argument before this court in 1997, however, the government maintained that it had no written documentation of Miles's complaint of police misconduct.[16]

---

14. Of course, if at least the written statement taken by Detective Page had been turned over to the defense, defense counsel could have investigated Miles's allegations and, presumably, have been led to the CCRB complaint and the taped interview. In either case, defense counsel would have had the material to which the defendant was entitled. The government's argument that because the defendant knew Miles, defense counsel easily could have contacted him rings hollow when the government failed to disclose a statement that would have turned counsel onto the significance of Miles as a potential witness and where both the government and defense counsel consistently have maintained that they could not find Miles for trial. *See Farley*, 694 A.2d at 889 n. 9.

15. The majority's reliance on *Cox v. District of Columbia,* 821 F.Supp. at 5 (D.D.C.1993), *aff'd* (without opinion), 309 U.S.App. D.C. 219, 40 F.3d 475 (1994), is to no avail. *Cox,* a civil rights action against the District of Columbia, details the CCRB's many failures. *Cox* does not address the government's obligation under *Brady* in a situation where it has notice of a complaint made to the CCRB. The Supreme Court's subsequent decision in *Kyles* is controlling on that point.

16. There are also two internal police memoranda in the record on remand which outline the MPD's investigation in 1997, five years after the incident, into Officer Zerega's alleged abusive conduct toward Dennis Miles. According to one of the memoranda, Miles

Having these various statements, the government was under an obligation to disclose them to the defense. Initially, the Supreme Court considered it a violation of due process if the government failed to disclose "evidence favorable to an accused upon request ... irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. In *Bagley*, the Court expanded on the "upon request" language, noting that "where the defense makes a specific request and the prosecutor fails to disclose responsive evidence .... the standard might be more lenient than in the situation in which the defense makes no request or only a general request." 473 U.S. at 681, 105 S.Ct. 3375 (citing *United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.")). In *Kyles*, the Court reiterated what it had said in *Bagley*, that "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433, 115 S.Ct. 1555 (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375).

Here, the defense made a fairly specific request. *See Farley*, 694 A.2d at 889 n. 7 (noting that "Farley filed a Motion to Compel Discovery requesting the identity of the officer and/or officers that were provided with exculpatory information by David Miles.") In its opposition to the Motion to Compel Discovery, the government responded that it had already provided Miles' name and address and the substance of his statements to the police officers who questioned him in his apartment on the night of the incident, but made no mention whatsoever of the statements Miles gave to the police at the Fifth District that same night, recorded by Detective Page, that Miles was beaten by the same officers who rushed into his apartment.[17] The record overwhelmingly supports that the government had in its possession, and failed to disclose, material favorable to the defense, notwithstanding that the government's attention should have been alerted to its existence by the defense's request. *See Brooks*, 296 U.S.App. D.C. at 222, 966 F.2d at 1503.

### B. Did the nondisclosure require reversal?

Whether there is a *Brady* violation depends on whether there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. This inquiry has more recently been refined by the Supreme Court in *Kyles*: "The question is not whether the defendant would more likely than not have received a different verdict with the

---

"refused to give further information" and "insisted that the matter be dropped." As the memoranda, and the police investigation they describe, occurred several years after the government's response to the defense request for documents and Farley's trial, they are irrelevant to the issue before us.

17. The government seems to argue that *Brady* does not apply because neither Miles's written statement to the police on the night of the incident nor his CCRB complaint identified any of the officers who testified at trial. By this, I take it the government means that Miles did not identify the officers by name. Miles's CCRB complaint did describe the officers by their appearance. It must be remembered that at least some of the officers who rushed into Miles's apartment were participating in an undercover drug buy-bust operation and would not have been wearing their badges. The police were on notice the night of the incident, however, that the officers in the operation (whose identity is information peculiarly and perhaps exclusively within the police's ken) had been accused by a witness of abusive conduct. Also the CCRB complaint identified by name an officer involved in the investigation of the crime. Thus, the police had a firm basis from which to execute its "duty to learn." *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555.

evidence, but whether *in its absence* he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555 (emphasis added).

In making such a determination, the starting point must be the withheld evidence. In addition to the statement Miles gave the police on the night of the incident, Miles's complaint to the CCRB is a detailed six-page document that sets out the police officers' conduct when they first came into his apartment running after the suspect the night of the incident and then, a few days later, when they returned to question Miles a second time. On the first occasion, according to Miles, the officers came to his apartment with guns drawn, threw him on the floor and, when Miles could not answer the officers' questions ("where did the fat guy go"?), repeatedly "punched" and "stomped [him] in the head." The beating stopped when, in response to an order "to get up," Miles "told them that I couldn't because I'm handicapped (paraplegic)." Miles alleges that one of the officers threatened that he would plant evidence in Miles's apartment, a brown bag with drug paraphernalia that had been found in his girlfriend's purse. According to Miles, the officers "went outside the back of my place where my kitchen window is and brought a man's coat and pistol. They said that they would charge me with all of it, including the drugs they found in the coat. I never heard or saw anyone come through my place." A few days later, two investigators returned to Miles's apartment. One of the officers showed Miles a search warrant, which was unsigned. When Miles told the officers that they could search "anytime without one," the answer he received was that "when we [the police] come back with the search warrant we're going to kick your door down and tear your property up. That's how we want to do it."

As the majority recognizes, the undisclosed material could have been used by the defense to impeach the police officers who stormed Miles's apartment for bias, thereby undermining their credibility. *Bagley* makes clear that "impeachment evidence ... as well as exculpatory evidence ... falls within the *Brady* rule." 473 U.S. at 676, 105 S.Ct. 3375. The officers' credibility was of utmost importance in this case because it was principally their testimony that identified Farley as the seller caught in the police buy-bust drug operation. Their identification was subject to question because the officers who participated in the undercover operation initially were unable to identify Farley from a photo array presented on the night of the incident; they identified him from a different photo array some ten days later.

I disagree with the majority's characterization that the officers' motivation was "to correctly identify the person" who assaulted one of the officers in the undercover operation. That is certainly one possible interpretation of the officers' motivation; but another possible interpretation is that the officers, being concerned about the consequences of their abusive treatment of a paraplegic, would have felt compelled to produce a suspect to justify their actions or hide some other questionable practice that they employed in their investigation of the case. Whichever motivation, it was for the jury, not a reviewing court, to decide. Similarly, the majority notes that there has been no showing that the officers who testified at trial knew of Miles's complaint. This formulation begs the issue. If the jury had been told of Miles's statements and believed Miles's version, the officers would have known what happened because they were there; they would not have needed to be told. Even if the jury believed that Miles's complaint was unfounded or exaggerated, the jury also could have believed that its existence might have influenced the officers' testimony because Detective Page, who took Miles's complaint at the police station the night of the incident, would have mentioned to his colleagues who participated in

the operation that they were being accused of serious misconduct.

The majority makes much of the fact that Miles's complaint did not identify any of the officers who testified in Farley's trial. As already noted, see *supra* note 18, however, while it is correct to say that the complaint to the CCRB did not identify by name any of the officers who testified in Farley's trial, it did identify another officer by name (Zerega) and others by appearance. The government chose not to call Officer Zerega as a witness. It is for the jury, not this court, to determine whether any of the officers who testified at trial were described in the complaint. As the trial court expressly recognized in its Remand Memorandum, the withheld documents, if believed, discloses police misconduct, "possibly including misconduct on the part of the police officers who identified Farley at his trial." [18]

The physical evidence provided by the contents in the pocket of the coat recovered by the police, although certainly probative, also was subject to challenge. Armed with Miles's statements that he did not see anyone run through his apartment and that the police brought the coat "from outside" and "from the kitchen," [19] competent defense counsel could have presented to the jury an argument that lessened the importance of the nexus between Farley and the coat pocket's contents by casting doubt as to the place where the coat was found by the police and emphasizing that Farley's coat had been stolen earlier in the day.[20] During the hearing on remand, the

government conceded that Miles's statement that the coat was brought in from the outside "would have to be turned over" under *Brady*.

The majority agrees with the trial court's analysis centered on its determination that disclosure of the withheld material would not have made a different result reasonably probable because even if bias were shown by the police generally or the identifying officers in particular, "such bias would not have undermined the force of ·the police officers' identifications and the strong corroborating evidence provided by the items identifying Farley found in the coat." As already noted, neither the police officers' identifications nor the physical evidence (the contents of the coat pockets) were as unassailable as the majority suggests. They surely would have been weakened by impeachment with Miles's statements.

Moreover, assessing the strength of the government's case is not the end of the required inquiry. As the Supreme Court made clear in *Kyles*, quite apart from the strength of the government's case, a *Brady* violation is established by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555. A reviewing court has to assume (absent evidence to the contrary and there is none here) that, if the defense had known about the substance of Miles's complaints of police misconduct, his statements that he did not see anyone run

---

**18.** Officer Johnson was one of the officers in the group of undercover police officers who rushed into Miles's apartment running after the suspect that Miles accused of abusive conduct; Officer Johnson identified Farley at trial.

**19.** The evidence established that the kitchen had an outside window, and the government posited at trial that the kitchen window was the escape route taken by the suspect as he was being chased by the police through Miles's apartment. The police also testified that the suspect's coat was found in the kitchen, by the window leading to the outside.

Therefore, it would have been fairly simple to harmonize Miles's statements that the police brought the coat into the living room "from outside" and "from the kitchen." See *supra* note 11.

**20.** The majority opinion (but not the trial court) also relies on a black baseball cap with an "X" found on the scene. Although the officers testified that the seller in the undercover drug purchase wore such a cap, there was no evidence tying the baseball cap to Farley.

through his apartment and his version concerning the coat that differed somewhat from that of the police, competent defense counsel would have found Miles and presented his testimony at trial. *Farley,* 694 A.2d at 889 n. 9. Miles's testimony, if believed, would have seriously impeached not only the officers' testimony at trial, but also more broadly, the propriety of the police's conduct of the investigation generally.

Miles's allegations of police misconduct went beyond rudeness and beating of a prospective witness who is a paraplegic, to threats of further physical violence, "planting" of evidence and fraudulent prosecution. Facing a complaint of such serious misconduct, the police could have been impeached with having an enhanced interest—beyond their usual interest in law enforcement—to "justify" their tactics by producing a perpetrator. In light of that evidence, as in *Kyles,*

> Damage to the prosecution's case would not have been confined to evidence of the eyewitnesses, for [Miles's] various statements would have raised opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation, as well.

514 U.S. at 445, 115 S.Ct. 1555.

I need not express my view about the accuracy of Miles's statements to the police and his complaint to the CCRB, save to note that a jury could have believed them as Miles's statements appear on the whole to be consistent, to include detail, and to have been promptly expressed. There has been no determination that Miles is not a credible witness.[21] *See* 514 U.S. at 436, 115 S.Ct. 1555 (requiring that suppressed evidence be "considered collec-

tively, not item by item"). I believe it is sufficient that the suppressed evidence was such that it would have been presented by the defense to the jury for its assessment, and that, if believed, it could have done serious damage to the government's case by presenting the officers who participated in the buy-bust operation and the ensuing investigation in a very different light than the one actually shown to the jury in this case. Having so concluded, I think that to engage in any finer assessment ignores the defendant's right to have counsel make an effective presentation to the jury with all the resources due process ensures and risks putting a reviewing court in the jury's role and usurping its prerogative with respect to crediting the testimony of witnesses, weighing the facts and considering the arguments of counsel.

For the above reasons I conclude that there was a *Brady* violation and reversal is required.

---

**21.** At the remand hearing and on appeal, the government suggests that Miles's denial to the CCRB investigator during the taped interview, when asked whether he knew Farley, undermines Miles's credibility in light of Miles's long term friendship with Farley. It may well be that a jury would consider these facts relevant to Miles's credibility, as it might also consider relevant that Miles may not have been disposed to disclose his friendship with Farley, especially if he knew Farley had recently been arrested. This is evidence that should have been presented to the jury for its assessment.