**Momolu B. STEWART, Appellant**

**v.**

**UNITED STATES, Appellee.**

**Nos. 98–CF–904, 02–CO–1177.**

District of Columbia Court of Appeals.

Argued Sept. 23, 2004.
Decided Sept. 1, 2005.

---

**2.** *See In re Edwards,* 870 A.2d 90 (D.C.2005); *In re Davenport,* 794 A.2d 602 (D.C.2002).

Robert S. Becker, Washington, DC, appointed by the court, for appellant.

L. Jackson Thomas, II, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, John R. Fisher, Elizabeth Trosman, Albert A. Herring, and Carolyn K. Kolben, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, WAGNER,* and REID, Associate Judges.

TERRY, Associate Judge:

Appellant was convicted of assault with a dangerous weapon and two related firearms offenses. On appeal he contends that a bullet and a pistol were erroneously admitted into evidence, arguing that they were irrelevant and that their probative value was outweighed by their prejudicial impact. He also challenges, on two grounds, the trial court's denial of his motion to vacate sentence under D.C.Code § 23–110 (2001). We affirm both the judgment of conviction and the denial of the § 23–110 motion.

I. THE TRIAL

A. *The Government's Evidence*

At approximately 4:00 p.m. on November 13, 1996, Joseph Funnyre borrowed

---

* Judge Wagner was Chief Judge of the court at the time of argument. Her status changed to Associate Judge on August 6, 2005.

his mother's van to drive his friend Timothy Musgrove to a day care center in an apartment complex in the 1500 block of F Street, N.E. Earlier that afternoon, Musgrove had asked Funnyre to give him a ride to pick up his son, and Funnyre agreed to drive Musgrove and wait for him.

Funnyre parked across the street across from the day care center and waited in the van as Musgrove went inside. When he looked in his rearview and side mirrors, Funnyre testified, he noticed three men standing nearby who were closely watching him as he sat there. He recognized all three—Mustafa Brown, Xavier Gray, and appellant Momolu Stewart—both by face and by name because they were neighborhood acquaintances he had known for several years; in particular, he knew appellant because they had attended grade school together. After a few moments, the three men slowly took up different positions around the van. Mr. Gray stood in front of the apartment complex, directly across the street from where Funnyre was parked, and "just stared" into the van. Mr. Brown walked past the van on the passenger side, continuing along F Street. At the corner he joined up with appellant, and after a brief conversation, they turned and walked back together toward the van.

Funnyre stated that when Gray and appellant were "about two car lengths" from the van, appellant suddenly reached into his waistband and pulled out a "shiny automatic" silver pistol. Funnyre immediately ducked, then started the van and sped away. As Funnyre fled, appellant ran between two parked cars into the street in front of him and shot at the van. Afterwards, Funnyre noticed a bullet hole on the right side of the front bumper. Although the entire incident lasted only a few seconds, Funnyre did not recall seeing anyone other than appellant pull a gun.

Funnyre also testified that appellant was wearing a green coat.

Mr. Funnyre drove immediately to his mother's house. Feeling "upset" and "kind of shocked," he did not report the shooting to the police because he feared that his mother would worry if the police came to her home. However, about half an hour later, Mr. Funnyre went to Mr. Musgrove's house and told him what had happened. That night, at approximately 10:30 p.m., after his mother had gone to bed, Funnyre drove the van to the Fifth District police station and gave a statement to Investigator Aris Paredes.

The testimony of Timothy Musgrove largely corroborated Mr. Funnyre's version of events. Musgrove said that Funnyre drove him to the day care center in his mother's van and parked it there, but he had disappeared by the time that Musgrove came out of the center with his son. After waiting for a few minutes, Musgrove and his son got a ride home from one of the teachers at the center. Within five or ten minutes after they arrived home, Funnyre knocked on his door. Musgrove described Funnyre as "nervous" and "scared," hurrying into the house as soon as Mr. Musgrove opened the door and pacing back and forth throughout their conversation. After Funnyre told Musgrove that "Momolu shot at me," Musgrove encouraged him to call the police. After about an hour, Funnyre left to return home.

At the police station, Investigator Paredes interviewed Funnyre about the shooting, prepared a written report, and performed a cursory inspection of the van in the station's parking lot. Paredes' testimony confirmed that Funnyre had identified Gray, Brown, and appellant Stewart as the three men involved, specifically naming Stewart as the shooter, and had described the silver handgun used in the

shooting. Two weeks later, on November 27, Funnyre positively identified appellant from an array of photographs that Investigator Paredes showed him.

Officer William Hyatt, an evidence technician, examined the van at Investigator Paredes' request. Hyatt testified that at approximately 10:00 or 10:30 p.m. on November 13 he took photographs of the van, the bullet hole in the front bumper, and a spent, nickel-plated 9–millimeter bullet which he recovered from "under the hood" on the vehicle's passenger side. The bullet was resting on the platform on which the windshield washer fluid reservoir was located.[1] Officer Hyatt also commented that nickel-plated bullets are "not … very popular." No fingerprints were recovered from the bullet, and neither Hyatt nor Paredes canvassed the F Street area where the shooting occurred.[2]

The parties stipulated that on January 16, 1997, pursuant to a warrant, the police searched a Pontiac that was used "in another incident" in which appellant was a suspect. During this search, the police recovered from the vehicle's trunk a "silver 9–millimeter semi-automatic pistol" and a "certificate in the name of Momolu Stewart issued by the Social Services Division of the Superior Court." The stipulation also included the fact that the Pontiac was registered to "an associate of Mr. Stewart's."[3]

Another evidence technician, Officer Joseph Anderson, who was involved in the search of the Pontiac, testified that he photographed the handgun, which was in plain view after the car's trunk was opened. No photographs were taken of the framed certificate, however, because Officer Anderson had to "dig" through the trunk and disturbed the certificate before discovering it. Moreover, appellant's name did not have any evidentiary significance to Officer Anderson at that time.

Officer Timothy Curtis, a firearms expert, was the government's final witness. He identified the recovered handgun as a Lorcin 9–millimeter Luger semi-automatic pistol. From his examination of the gun and the bullet recovered from the van, Curtis concluded that the gun and the bullet shared the "same general rifling characteristics," indicating that the pistol was capable of having fired the bullet, although other pistols could also have fired it.

### B. The Defense Evidence

Appellant did not testify, but he called two witnesses in his defense: Gloria Smith, his mother, and Clement Stokes, a private investigator hired by his former trial counsel. Mrs. Smith corroborated

---

1. Officer Hyatt testified that he recovered the bullet that night, November 13, but it was later established that this testimony was incorrect. He did not actually recover the bullet until February 4, 1997, almost three months later, when Mr. Funnyre returned with the van to the police station. Moreover, in a post-trial affidavit Officer Hyatt acknowledged that after he removed the bullet from the van, he kept it secured in his evidence locker and did not formally log it into the police station's property book until February 22.

2. Paredes conceded in his testimony that, at the time he worked on this case, he was an automobile theft investigator and was not very experienced in handling violent crime investigations.

3. The trial court, outside the presence of the jury, heard additional facts about the "other incident." The government disclosed that the recovered pistol had been identified as the handgun that was used during the commission of two murders for which appellant was then awaiting trial. The Pontiac was registered to Kareem McCraney, appellant's co-defendant in the murder cases and a cousin of Xavier Gray.

that appellant had once possessed a "boot camp" certificate of completion. On cross-examination, she acknowledged that the framed certificate, once displayed in her living room, was missing and that someone, possibly appellant, must have removed it. Mrs. Smith also testified that appellant did not own a green coat like the one that Mr. Funnyre said he saw appellant wearing during the shooting. However, she conceded that her son did not live with her for part of 1996, including the day of the shooting, and that he therefore might have owned clothing that was unfamiliar to her.

Mr. Stokes testified that he canvassed the 1500 and 1600 blocks of F Street, N.E., interviewed persons to learn if anyone knew anything about the shooting, and took photographs of the surrounding area. Stokes described F Street between 15th and 16th Streets as a "very narrow" one-way street with cars parked along both sides. He therefore concluded that a person leaving the sidewalk and walking into the street could not avoid being struck by a vehicle driving down F Street.

## II. THE § 23–110 MOTION

While the appeal from his conviction was pending, appellant (represented by new counsel) filed a motion to vacate his sentence under D.C.Code § 23–110, asserting that his trial counsel had rendered ineffective assistance in several respects. He alleged that his attorney had failed to take preventive action to bar admission of the evidence about the pistol and the bullet; failed to interview potential witnesses, including in particular a woman—identified only as "Versace"—with whom appellant claimed to have had a conversation on the day of the shooting; failed to cross-examine the government's witnesses effectively; agreed to a stipulation that was highly prejudicial without requesting a cautionary instruction; and generally undertook little or no pre-trial investigation.

After the government filed an opposition and appellant filed a reply, the court issued an order rejecting several parts of appellant's claim of ineffective assistance. The court denied those portions of the § 23–110 motion based upon defense counsel's failure (1) to interview "Versace," the unidentified woman (finding this assertion "vague and conclusory"),[4] (2) to object to the admission of the recovered bullet and pistol (noting that the trial transcript showed that counsel "did, in fact, object to the admission of the firearm and the bullet"),[5] and (3) to object to the stipulation about the discovery of the pistol in Kareem McCraney's car (because the decision not to object was "trial counsel's reasonable trial strategy" and because appellant had "failed to establish prejudice with respect to the admission of the firearm and the bullet"). The court then scheduled a hearing to consider the remainder of appellant's motion.

The first witness at the hearing was Leonard Birdsong, appellant's trial counsel. Mr. Birdsong had succeeded another attorney, Richard Gilbert, who originally represented appellant. At the outset of

---

**4.** The court went on to say:

Not only does defendant fail to offer any evidence that this unknown woman would have any relevant first-hand knowledge regarding the instant offense, but defendant fails to offer any evidence that this unknown woman is willing to testify today or, for that matter, at defendant's trial almost four years ago.

**5.** After counsel's objection was denied, the court said, "counsel chose to opt for a stipulation regarding the firearm. This sort of decision should be given wide latitude as an example of trial strategy. . . . The court will not second-guess trial counsel's reasonable trial strategy decisions."

his testimony, Mr. Birdsong adopted an earlier affidavit which had been filed along with the government's opposition to the § 23–110 motion, in lieu of testifying to its contents. That affidavit stated in part:

During my conversations with Mr. Stewart, he told me that he didn't do it but that Funnyre was saying that it was him. Allegedly Funnyre was afraid of Mr. Stewart and wanted him off the street because of the rivalry between their two groups. Supposedly Funnyre's group had killed Mr. Stewart's best friend Chip. I could find no support for any of this through my investigation. My investigator attempted to locate Mr. Funnyre but was unsuccessful.

Mr. Birdsong testified that, during one of their initial meetings, appellant supplied the names of Mustafa Brown, Robert Craig, "Versace," and "Darren" as possible witnesses. On another occasion, appellant suggested that Mustafa Brown and Xavier Gray be called to testify, telling Mr. Birdsong that "they will say whatever you want them to say." Mr. Birdsong, understanding this statement to mean that appellant "wanted me to get them to perjure themselves," decided that it might be in appellant's best interest not to talk to Brown and Gray, because otherwise they "might be treading very close to perjury." He acknowledged that he did not put on the stand any alibi witnesses, explaining that he did not believe that any witnesses were available who could provide an alibi without perjuring themselves. As for "Darren" and Robert Craig, Mr. Birdsong said he was unable to locate them.

On cross-examination, appellant's counsel questioned Mr. Birdsong's choice of trial strategy:

Q. And when you argued to the jury, your only real explanation for why Mr. Funnyre might have fabricated this was that he didn't want to have to go home and tell his mother how the bullet holes got in [her] car; is that correct?

A. ... I did not believe that there was credible evidence that there was a fight between two gangs, and didn't want that to come out. I didn't think that's what the jury should hear in this case. I thought it was very plausible that a man who borrows his mother's car [and] gets a bullet hole in it might want to make up a story to tell his mother, when he took that car back.

Mr. Birdsong did not believe that suggesting to the jury that the alleged shooting arose from gang retaliation (because appellant had allegedly followed Mr. Funnyre prior to this incident) was the "right strategy" because "it would make [appellant] look like a thug." Instead, he relied on other defense theories in an effort to raise a reasonable doubt. One such theory was that Mr. Funnyre simply fabricated the whole story about the shooting "because he didn't want to tell his mama he had been somewhere where he got his car shot up. The implication is that he was somewhere buying dope or something like that." Mr. Birdsong said he also undermined the police testimony by getting Investigator Paredes to admit "about five or six mistakes that he had made with respect to taking the statement [from appellant]; he said there were mistakes; he indicated he was new at this," and by emphasizing the fact that the police firearms testing did not establish a positive match between the bullet and the gun. Finally, he advanced the possibility that if the incident had occurred as Funnyre described it, with appellant running into the street from between two parked cars, then "the shooter would have been hit by a car."

Counsel also questioned Mr. Birdsong's decision not to challenge the government's case in chief when Officer Hyatt's responses to the prosecutor's questions indicated

that the bullet in evidence was recovered on the day of the shooting. When counsel suggested that Mr. Birdsong was unaware that the bullet had not been recovered until three months later, Mr. Birdsong conceded that the jury never learned about the three-month gap from him because he "wanted to distance [appellant] from the bullet and the gun at trial ... [and] didn't want to talk about the bullet at all."

Finally, Mr. Birdsong testified that he did not raise any chain of custody issues because he did not believe that challenging the chain of custody offered any realistic likelihood of winning the case. He added, however, that before trial he objected to the admission of the gun and the bullet as "very prejudicial other crimes evidence."

Another attorney, Veronice Holt, testified that she first met appellant after he expressed dissatisfaction with Mr. Birdsong's representation and sought new counsel. At that time he had been charged in two pending cases (the instant assault case and a separate murder case) and had asked Frances D'Antuono to represent him. Ms. D'Antuono asked Ms. Holt to assume representation in the murder case, in which Kareem McCraney was a co-defendant.[6] Ms. Holt interviewed Xavier Gray, who fully cooperated with her investigation, although she never called him as a witness.

At the conclusion of Ms. Holt's testimony, the hearing adjourned for the day, to be continued two weeks later. When the proceedings resumed on the scheduled date, appellant's counsel requested a further continuance, asserting at an *ex parte* bench conference a possible *Brady* violation[7] stemming from the government's disclosure of a January 1997 police report (which included two police forms, PD–251 and PD–252) to counsel only "fifteen minutes" before the hearing started.[8] Counsel explained that he had asked Investigator Paredes to search for "any additional reports that had anything to do with the recovery of the bullet" and that eventually Paredes found this report, which the government admitted obtaining nearly two weeks earlier, shortly after the previous hearing. Counsel emphasized that when Officer Hyatt photographed the van on the night of the shooting, his photographs

---

**6.** Ms. Holt explained that certain evidence in that murder case, specifically the 9–millimeter pistol found in the trunk of McCraney's car, was compared with the bullet removed from Funnyre's van in the instant case. She said that the bullet's chain of custody "was all messed up" because the bullet was not recovered until February 4, several months after the shooting, and was not recorded in police records for more than two weeks after its discovery. After assuming representation of appellant and inspecting several police records, including the chain of custody documents for the bullet, she concluded that the weakness in the chain of custody was "critical evidence that a jury should have heard." Ms. Holt also cited chain of custody concerns with regard to the pistol recovered in the other case, in which Mr. McCraney's car was seized and left in an "open location" on January 1 and the search that yielded the pistol was not undertaken until January 16. At this point

the trial court, noting that Ms. Holt's testimony was straying too far afield, cautioned appellant's counsel that the issues to be addressed at the hearing were "fairly narrow," and that the evidence should be focused on "why Leonard Birdsong did not interview these witnesses" and whether his failure to do so amounted to ineffective assistance.

**7.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**8.** The actual police documents are not in the record on appeal. Appellant's brief, however, states that according to these reports, Mr. Funnyre alleged that on January 11, 1997, while he was driving near his home, appellant shot at the rear of his van and left a bullet hole in the van's "trunk door." Mr. Funnyre allegedly reported this incident on January 15, 1997, the day after appellant was arrested in the instant case.

showed one bullet hole in the van's front bumper and another hole in the rear bumper. On this basis, counsel contended that "[i]f the hole in the rear bumper was present in November, then this [previously undisclosed] report goes clearly to Funnyre's credibility and to his bias against Mr. Stewart":

> [I]f the picture ... showing the hole about which he's talking, one hole in the rear of the van, [was] taken on November 11th, then this clearly was impeachment evidence of the complaining witness, because [in Funnyre's police report] he claimed that hole was made in January, two months after the other incident. And I cannot ascertain that at this point and may wish to call Richard Gilbert, who was counsel in this case before Mr. Birdsong and who got all the discovery. And Mr. Gilbert is out of town this week.... [I]n questioning the witnesses, both Mr. Herring [the trial prosecutor] and Officer Hyatt, I need to do some investigation because I need to be able to pin down when those pictures were taken, and Mr. Hyatt now tells me that although he took pictures on both occasions, January 13th and February 4th, and he knows that the picture of the bullet was taken on February 4th, he cannot tell me what date the picture of the car—I mean, he testified at trial that the pictures of the car were taken in November, but he's now changing, you know, saying well, I can't for sure say that, and at that point, I can't put him on the stand.... [T]o make me go forward on that basis with witnesses who are hostile witnesses to begin with ... seriously jeopardizes Mr. Stewart's rights.

The court denied the request for another continuance, and the hearing resumed.

Frances D'Antuono testified that, as appellant's counsel in one of his murder cases, she received notice that the government intended to introduce "other crimes" firearms evidence from the instant case and perhaps to call witnesses common to both cases. To prepare for these possibilities, she investigated "the entire Funnyre matter" and received from the government most of the documentary evidence that it later introduced at trial in the instant assault case except for the "PD–81 and any 695's or 668's," police reports "relating to the recovery of the bullet from Funnyre's van." According to Ms. D'Antuono, these documents were "glaringly absent" during discovery, despite several requests that she made for them.

Ms. D'Antuono also said that her investigator interviewed Brown and Gray, both of whom fully cooperated, and sought unsuccessfully to locate Versace. She believed that Versace "was findable if we had gotten all the way to trial" in the murder case because she had "information" about the block where Versace lived and had "a good description" of her house and of Versace herself. Ms. D'Antuono also stated:

> [T]here wasn't any information that I had that corroborated Joseph Funnyre's version of the events at all, and in fact I had information that contradicted it. So I didn't have any reason to disbelieve [appellant] in what he was telling me, and it checked out by interviews with [Brown and Gray]. So, no, I had no reason to believe that he was telling me an untruth with respect to what he proffered Versace would say.

Officer Hyatt, called to the stand by appellant's counsel, conceded that he could not "say with any degree of certainty" that the hole in the van's bumper was caused by the bullet he recovered from the van on February 4, or even that the bullet had been there since the day of the shooting.

Albert Herring, the prosecutor at appellant's trial, testified that he had given cop-

ies of two documents to appellant's original defense counsel, Mr. Gilbert: a PD–81 report and a "supplemental evidence report, which was redacted in part," both of which related to the recovery of the bullet. Mr. Herring also said that he had spoken to friends and relatives of appellant, Mr. Brown, and Mr. Gray, and learned that they all lived in the same apartment complex and were all friends or even "close friends" before the day of the alleged shooting.

Mustafa Brown, although present in the courtroom, asserted his Fifth Amendment privilege and chose to not testify at the hearing. Investigator Paredes testified briefly about the hole in the rear bumper.

At the conclusion of the hearing, the court denied the remainder of appellant's § 23–110 motion:

> [I]t seems to me that this is a very, very clear case where there has been nothing to indicate that the strategic and tactical decisions that were employed by Leonard Birdsong at trial in this case, were inappropriate in the context of the evidence, were not discussed with Mr. Stewart himself, and were the product of any lack of investigation or lack of preparation for trial in the case.
>
> \* \* \* \* \* \*
>
> [I]t's very clear now that the petitioner has not made out his claim of ineffective assistance of counsel .... [H]aving heard this evidence, what is clear beyond doubt is that this petition is grounded on hindsight based on the outcome of this case.

The court found "problematic" the chain of custody issue because of the lapse in time between the shooting in November 1996 and the recovery of the bullet from Funnyre's van in February 1997. However, the court went on to credit Mr. Birdsong's testimony about "the most likely winning strategy for the defense in this case, why he made those decisions, and indeed his own concern and determination not to be a party to the subornation of perjury in the case."

### III. THE DIRECT APPEAL

In the direct appeal from his conviction, appellant contends that the bullet recovered from the victim's van and the pistol seized from Kareem McCraney's car were essentially irrelevant and highly prejudicial, and that the trial court abused its discretion by admitting them. We find no error.

 "Relevant evidence is that which tends to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977) (citation omitted), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978); *see also* FED. R. EVID. 401. "[T]he test for relevance is not a particularly stringent one," *Street v. United States,* 602 A.2d 141, 143 (D.C.1992) (citation omitted), requiring only a "reasonable possibility" of a link between the contested evidence and the crime. *Winfield v. United States,* 676 A.2d 1, 4 (D.C. 1996) (en banc). Furthermore, a decision on an issue of relevance is entrusted to the trial court's discretion, to which we owe substantial deference; we will overturn it only on a showing of abuse of discretion. *See, e.g., Bowman v. United States,* 652 A.2d 64, 68 (D.C.1994); *Punch,* 377 A.2d at 1358. Similarly, any determination that the probative value of evidence outweighs its prejudicial effect "is quintessentially a discretionary function of the trial court," which we review only for abuse. *Johnson v. United States,* 683 A.2d 1087, 1095 (D.C. 1996) (en banc) (citations omitted); *accord, e.g., Busey v. United States,* 747 A.2d 1153, 1165 (D.C.2000).

Appellant argues that this court has, at least in part, adopted FED. R. EVID. 901, which seems to require "authentication" as a condition precedent to the admission of evidence in federal courts. For this proposition he cites *Murphy v. McCloud,* 650 A.2d 202, 214 (D.C.1994), and *Springer v. United States,* 388 A.2d 846, 852 (D.C. 1978). The government points out that, with specific and limited exceptions, the Federal Rules of Evidence generally do not apply in the District of Columbia courts, *see In re D.M.C.,* 503 A.2d 1280, 1283 (D.C.1986), and emphasizes that "reasonable possibility," rather than "authenticity," is all that must be shown in order to make the bullet and the pistol admissible in this case. The government is correct. *See Winfield,* 676 A.2d at 5 ("disavow[ing]" a "more exacting standard of relevance"). Contrary to appellant's argument, this court did not adopt Rule 901 in either *Murphy* (discussing the admissibility of birth certificates) or *Springer* (discussing the admissibility of tape recordings). Moreover, even if *Murphy* applied to this case, as appellant contends, that decision merely states that "[w]here there is reason for suspicion that a document is not what it purports to be, the trial judge, in the exercise of his or her discretion, may exclude it from evidence." *Murphy,* 650 A.2d at 214 (citation omitted). *Springer* is to the same effect. *See* 388 A.2d at 852. Thus neither *Murphy* nor *Springer* departs from the well-established principle that relevance determinations are within the sound discretion of the trial court, subject to review only for abuse.

■ The reasonable possibility standard does not require absolute certainty. As the government correctly notes, the absence of a definitive link to the crime or the defendant merely affects the weight of the evidence, not its admissibility. *See Busey,* 747 A.2d at 1165 (upholding the admission of testimony that defendant possessed a pistol which "might" have been the murder weapon and the admission of five .38 caliber cartridges found in his apartment, holding that these items were "directly relevant ... because [they] constituted evidence supporting the charge that Busey was the person who robbed and murdered [the victim]"); *Ali v. United States,* 581 A.2d 368, 374–375 (D.C.1990) (affirming the admission of photographs and descriptions of a "similar" shotgun and "similar" shotgun shells that were not clearly shown to have been the actual items used in the murder); *Lee v. United States,* 471 A.2d 683, 684–686 (D.C.1984) (affirming the admission of a knife allegedly used by defendant during a rape, when the knife was found in his car sixteen hours after the rape and the victim described the knife without having seen it before or during trial).

Appellant argues that the pistol and the bullet do not connect him to the crime and that *Burleson v. United States,* 306 A.2d 659 (D.C.1973), requires their exclusion. In *Burleson,* following an armed assault, the police found the defendant's unoccupied car parked approximately twelve blocks from the scene of the crime and staked out the car until the defendant arrived five hours later in another car owned and driven by his brother. After an inconclusive search of the defendant's car, the police then searched his brother's car and discovered a .38 caliber pistol under the front passenger seat. The gun and six rounds of ammunition taken from the gun were admitted into evidence. The victim then testified that he was "reasonably sure" that the gun in evidence was the one used in the assault, although he was not positive because "all .38s look alike." The defendant claimed that the gun seized from his brother's car belonged to another relative. We reversed the conviction, holding that the gun should not

have been admitted because "any connection between [it] and the alleged assault would be purely conjectural." *Id.* at 661.

■ Appellant contends that "through a lengthy chain of inferences" he is even further removed from the pistol and the bullet than the defendant in *Burleson.* He points to the fact that the bullet was not recovered until nearly three months after the shooting and one month after the pistol was seized from Mr. McCraney's car, and that the police could not conclusively determine whether the recovered bullet was fired before its discovery on February 4.

But his connection to the pistol is not as attenuated as he suggests. Appellant focuses on the fact that the pistol was not seized until two months after the shooting and emphasizes that the only corroborative identifying evidence was the presence of his boot camp certificate in the trunk where the pistol was found. That pistol, however, matched Mr. Funnyre's description of the gun used in the November 13 shooting. Unlike the tepid identification offered by the *Burleson* victim who said that "all .38s look alike," Mr. Funnyre's description—a "shiny automatic" pistol with a color "like silver," a "silver automatic gun"—was sufficiently precise and unambiguous to make the gun and its ammunition admissible. Case law supports this conclusion. For example, in *Hollingsworth v. United States,* 531 A.2d 973 (D.C. 1987), a robbery victim "testified that the gun recovered by the police on March 24, an unusual ... .38 caliber revolver, was the same one that the robber pointed at him on February 14. That testimony was sufficient to make the gun and its accompanying ammunition admissible on the armed robbery charge." *Id.* at 982 (citations omitted). *Accord, e.g., Adams v. United States,* 379 A.2d 961, 964 (D.C. 1977) (upholding admission of a gun in an

armed robbery trial, when one victim said it was "identical" to the one used in the robbery and the other victim said it was "probably the same"); *United States v. Jackson,* 166 U.S.App.D.C. 166, 175 n. 73, 509 F.2d 499, 508 n. 73 (1974).

Furthermore, the expert testimony of Officer Curtis established the connection between the pistol, the bullet, and the crime as more than "purely conjectural." *Burleson,* 306 A.2d at 661; *see also Busey,* 747 A.2d at 1165 (connection of the gun with the murder was not "conjectural and remote"). Officer Curtis testified that, after his examination of the pistol and the spent bullet recovered from Funnyre's van, he was satisfied that the pistol recovered from the trunk was capable of firing that bullet. Although his testimony was not sufficient in itself to establish appellant's guilt, it did establish a "reasonable possibility" that the bullet recovered from the van was fired at Mr. Funnyre from the gun found in Mr. McCranery's car. A reasonable possibility was all that was needed to make both the bullet and the gun admissible.

■ Finally, appellant argues that, even if relevant, the gun posed a risk of undue prejudice that substantially outweighed its probative value. This argument lacks merit. As is obvious from many of the cases we have cited, firearms are commonly admitted into evidence in criminal trials. Appellant overreaches when he argues that juries are so inflamed by the sight of a gun that they will simply disregard the court's instructions to decide the case without prejudice and to base their verdict solely on the evidence. Absent any showing to the contrary, juries are presumed to follow the trial court's instructions. *E.g., McCoy v. United States,* 760 A.2d 164, 186 (D.C.2000). Appellant has not persuaded us that the court abused its discretion in concluding that the

bullet and the gun were more probative than prejudicial.

We find no error in the admission of either the bullet or the gun.

### IV. THE § 23–110 APPEAL

In his appeal from the denial of the § 23–110 motion, appellant argues that his trial attorney rendered ineffective assistance in several different respects. He also maintains that his due process rights under *Brady v. Maryland, supra* note 7, were violated by the government's tardy disclosure of certain police reports. We hold that the trial court was correct in ruling that there was neither ineffective assistance nor a *Brady* violation.

▋ To establish ineffective assistance of counsel, a convicted defendant must make a two-part showing. He must demonstrate both deficient performance by defense counsel and prejudice resulting from that deficiency. Prejudice in this context means "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Deficient performance means that counsel's conduct fell below a standard of "reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. Furthermore, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052 (citation omitted). With these principles in mind, we turn to appellant's specific contentions.

### A. *The Failure to Interview Potential Witnesses*

Appellant claims that his counsel was ineffective because, in preparation for trial, he refused to interview either Mustafa Brown or Xavier Gray and did not locate the woman identified only as "Versace."

▋ Mr. Birdsong testified at the hearing that appellant had told him before trial that Brown and Gray were his friends and that "they will say whatever you want them to say." From this comment Mr. Birdsong concluded that not talking to these two men would be in appellant's best interest because otherwise they "might be treading very close to perjury." He conceded that he did not present any alibi witnesses, but he explained that he did not know of any available witnesses who could provide an alibi without perjuring themselves. This court, like all courts, has recognized that "an attorney has a duty not to present false testimony to a court." *Tibbs v. United States,* 628 A.2d 638, 640 (D.C.1993). In his brief, appellant concedes that "under prevailing professional norms it would have been reasonable for counsel not to call Brown or Gray to testify if he believed either man would commit perjury." We cannot conclude that counsel was ineffective because he refused to present perjured testimony. *See id.* at 640–641.

▋ In support of his § 23–110 motion, appellant submitted to the trial court affidavits from both Brown and Gray. Appellant now argues that because Brown's affidavit said he was with appellant on the afternoon of November 13, counsel failed in his professional duty by not interviewing Brown to explore this potential alibi. But the affidavit is vague about the time and place when Brown was allegedly with appellant, and of course we cannot overlook the fact that Mr. Funnyre testified that he was shot by appellant in that same afternoon and that Brown was there at the scene—in other words, that Brown's po-

tential alibi was not an alibi at all. Moreover, it is more than likely that Brown would not have been available to testify at appellant's trial, because at the post-trial hearing Brown asserted his Fifth Amendment right and refused to testify on appellant's behalf. Appellant offers us no reason to believe that Mr. Brown would have behaved differently and chosen to testify at the trial. *See Sykes v. United States,* 585 A.2d 1335, 1340 (D.C.1991).

 In a similar vein, we cannot say that counsel was ineffective for failing to interview Mr. Gray. In his affidavit Gray reported that he was approximately a block away from his home at 1517 F Street, N.E., when he heard shots. He said he ran toward the spot where the gunfire came from, but found nothing unusual there. Thus, by his own admission, Gray was not present at the scene of the shooting and did not arrive until after it had occurred. Since he was not an eyewitness and his testimony would not have provided "any new evidence helpful to appellant," counsel's decision not to call him as a witness does not amount to ineffective assistance. *See Joseph v. United States,* 597 A.2d 14, 23 (D.C.1991). The trial court thus properly concluded that even if Gray had testified as set forth in his affidavit, appellant failed to show with any "reasonable possibility" that the trial's outcome would have been different.

 As for Versace, the court found that appellant's contentions regarding counsel's failure to locate this mystery woman were "vague and conclusory."[9] Appellant did not present any evidence that Versace possessed any relevant firsthand knowledge about the shooting or that, if located, she would have been willing to testify at his trial. Furthermore,

his assertion that, had defense counsel interviewed Gray and Brown, Versace might have been located, is also without merit. Even appellant's current counsel, who did interview Brown and Gray, has been unable to identify Versace or determine her whereabouts. Without some kind of statement or proffer as to what her testimony might have been, appellant cannot make the necessary showing of prejudice required under *Strickland.* The trial court therefore did not err in rejecting appellant's complaint about counsel's failure to find and interview Versace. *See Lanton v. United States,* 779 A.2d 895, 901 (D.C. 2001).

### B. *The Delay in the Recovery of the Bullet*

 Appellant asserts that his counsel was ineffective because he failed to realize that the bullet introduced at trial had not been recovered from Mr. Funnyre's van on the date of the shooting, as Officer Hyatt had testified. Appellant contends that the lapse of time—the bullet was not discovered until February 1997, almost three months after the shooting—created a breach in the chain of custody that gave counsel sufficient cause to attempt to exclude both the pistol and the bullet. Additionally, appellant argues that counsel should have impeached Investigator Paredes and Officer Hyatt with this discrepancy in their testimony. He reasons that if counsel had done all these things, the jury would have viewed the evidence differently.

 Appellant's contention misses the mark, however, because the delayed discovery of the bullet did not affect the chain of custody. Under a proper chain-of-cus-

---

9. Counsel was also unable to locate the two other alleged alibi witnesses, Robert Craig and "Darren," but appellant does not now claim that he was prejudiced by counsel's failure to find them and call them as witnesses.

tody analysis, the government was required to prove only that the bullet recovered from the van was the same bullet analyzed by Officer Curtis. *See Turney v. United States,* 626 A.2d 872, 873 (D.C. 1993); *Tompkins v. United States,* 272 A.2d 100, 103 (D.C.1970). Appellant's argument attempts to graft a heightened requirement of authenticity onto a standard that requires the government to prove only that the evidence analyzed by the police is the evidence that was actually seized. In addition, the delay in finding the bullet would have had no effect on the admissibility of the gun, which was found in the trunk of McCraney's car along with a certificate bearing appellant's name (establishing a connection between appellant and the gun). The bullet, in turn, was sufficiently linked to the gun by Officer Curtis' testimony to make it admissible, notwithstanding the delay. As the government points out in its brief, regardless of how or when the bullet ended up in the engine compartment of the van, "there still would have been a sufficient link between appellant and the pistol—and thus the bullet—for both the bullet and the pistol to have been admissible."

Thus it comes as no surprise that Mr. Birdsong testified at the hearing that, as a tactical matter, he did not challenge Officer Hyatt's testimony because doing so would have drawn more attention to the bullet. Instead, his theory of defense was limited to the argument that the police could not definitively conclude that the spent bullet came from the recovered gun or caused the hole in the van's front bumper. On this record, appellant cannot establish that, but for counsel's allegedly deficient performance, the outcome of the trial would have been different.

■ Finally, appellant asserts that the government engaged in misconduct by failing to recognize and correct the mis-

take in the police testimony regarding the actual date of the bullet's recovery. It is well settled that a prosecutor may not knowingly present false evidence or permit the introduction of evidence known to be false. *See, e.g., Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Nor may the government, "although not soliciting false evidence," knowingly "allow[ ] it to go uncorrected when it appears." *Id.* (quoting *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). At the § 23–110 hearing, the prosecutor acknowledged his mistake and assured the court that his asking a question that incorrectly referred to finding the bullet in November 1996, rather than the correct date of February 1997, was a "completely inadvertent" oversight. There was no contrary evidence. Nothing in the record indicates that the prosecutor's error, regrettable as it was, involved "deliberate deception" or the intentional solicitation of perjured testimony.

### C. *The Stipulation and Mr. Funnyre's Alleged Bias*

■ Next, appellant argues that his attorney's decision to stipulate, after the gun's admission, that appellant was a suspect in "another violent crime" without asking for an immediate cautionary instruction amounted to ineffective assistance. But the assertion in his brief that "the revelation that Stewart was a suspect in another violent crime [would have] had no relevance to this case" mischaracterizes the content of the stipulation, which stated only that the car from which the police seized the gun "was used in another incident in which Mr. Stewart is a suspect." The language in the stipulation did not mention a "violent crime," nor did it say anything about the nature of the "incident" in which appellant was involved.

More importantly, defense counsel's agreement to the stipulation reflected a sound trial strategy, designed to avoid the risk of opening the door to any evidence of appellant's involvement in other crimes that could further tie him to the recovered gun. Any indication that appellant had used this same pistol in a murder would have established his "possession of the physical means of committing the crime . . . ." *Coleman v. United States,* 379 A.2d 710, 712 (D.C.1977). Such evidence would have been relevant to the issue of identity in this case, *i.e.,* whether appellant was the man who shot at Mr. Funnyre. The trial court could reasonably conclude that counsel's agreement to the stipulation, with no reference to a murder or any other "violent crime," mitigated the serious risk that the jury might learn about the nature of the other "incident" in which appellant was a suspect. We have no difficulty in concluding that counsel's decision to forego seeking a cautionary instruction, in lieu of a stipulation that merely characterized his client as a suspect "in another incident," was a legitimate tactical decision.

 Appellant's claim that counsel should have cross-examined Mr. Funnyre about his alleged bias toward appellant suffers from the same defect. The bias of a witness "may be a crucial component in the jury's assessment" of that witness' credibility, and thus bias is always a proper subject of cross-examination. *Foreman v. United States,* 792 A.2d 1043, 1056 (D.C. 2002) (citations omitted). But nothing in the record before us rebuts *Strickland's* weighty presumption of professional competence, nor do we have any reason to question defense counsel's explanation, at the § 23–110 hearing, that he deliberately chose to forego exploring Mr. Funnyre's bias because such cross-examination could ultimately have portrayed appellant as a "thug." Counsel's decision to avoid the risk of introducing evidence that associated his client with "a gang or someone who was killed or possible guns or some kind of feud"—information that might even have supplied a motive for the shooting and spoiled appellant's defense—was, again, a legitimate tactical choice.

## D. The Alleged Brady Violation

During the second day of the § 23–110 hearing, the government provided appellant's counsel with copies of police reports in which Mr. Funnyre reported another shooting incident that allegedly occurred on January 11, 1997. Appellant now contends that these reports were *Brady* material which was improperly withheld.

 *Brady* established that the government has a "constitutional duty to disclose material evidence favorable to a criminal defendant in time for the defendant to make effective use of it at trial." *Ginyard v. United States,* 816 A.2d 21, 32 (D.C.2003). This duty "extends to evidence that could be used to impeach the credibility of a government witness." *Id.* However, when *Brady* material "has not been timely disclosed, reversal 'is warranted *only* where there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Farley v. United States,* 767 A.2d 225, 228 (D.C.) (emphasis in original; citation omitted), *cert. denied,* 534 U.S. 982, 122 S.Ct. 415, 151 L.Ed.2d 316 (2001). A "reasonable probability" of a different result exists when the undisclosed evidence "undermines confidence in the outcome of the trial." *Ginyard,* 816 A.2d at 32 (citations omitted). But the burden of establishing a "reasonable probability" rests with the defendant, and a "mere possibility" that the undisclosed evidence *might* have aided the defense or changed the trial's outcome does not make

the evidence material to guilt or punishment. *Id.*

When, as in this case, the trial court has determined that the asserted *Brady* material would not have affected the verdict, we have said that independent review is precluded and that this court need only determine whether the trial court's decision was "reasonable." *Davies v. United States,* 476 A.2d 658, 661 (D.C.1984) (citing *United States v. Agurs,* 427 U.S. 97, 114, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). More recently, however, we have recognized that the independent or *de novo* review that *Davies* precluded may in fact be required in light of the standard of review for *Brady* rulings outlined in later decisions of the Supreme Court and other federal courts. *See Farley,* 767 A.2d at 228–229. We need not decide in this case which standard applies, however, because appellant has failed to show "reasonable probability" under either standard of review. *See Rowland v. United States,* 840 A.2d 664, 687 (D.C.2004); *Benton v. United States,* 815 A.2d 371, 373 n. 3 (D.C.2003); *Bennett v. United States,* 797 A.2d 1251, 1255 n. 6 (D.C.2002); *Farley,* 767 A.2d at 228–229.

■ Appellant asserts that "[b]ecause the ... holes [in the bumper] were made in the rear of the vehicle no later than November 13, 1996," the January police report, indicating the discovery of an additional bullet hole in the van's trunk door, "clearly demonstrated that Funnyre lied to the police about the damage to his mother's car, and that he was biased against appellant." This argument assumes that the three holes found in the van's rear bumper on two different occasions were in fact made at the same time. On that basis, appellant claims that the government's failure to provide him at trial with the police reports, including the PD–251 and PD–252 prepared in January 1997, violated the government's duty to disclose

under *Brady* and *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

This argument is without merit because it overlooks the fact that, of the four holes in the van, the only one pertinent to this case was the hole in the front bumper that resulted from the shooting on November 13. As the trial court noted at the § 23–110 hearing, Mr. Funnyre's statement in the police reports appeared to be "very consistent" with his trial testimony. Appellant may be correct when he states in his brief that *Brady* "does not impose on defense counsel a duty to produce evidence justifying a request for exculpatory evidence," but the holes in the rear of the van were irrelevant and thus would not have been probative of any issue at appellant's trial. *See Winfield,* 676 A.2d at 4. If neither the PD–251 nor the PD–252 was "evidence favorable to [the] accused," *Brady,* 373 U.S. at 87, 83 S.Ct. 1194, evidence of the additional holes was not *Brady* material.

■ We have no reason to disagree with the trial court's assessment that the government's case was strong and that Mr. Stewart "did not come close" to showing a need for post-conviction relief. The crux of his *Brady* challenge was that the police report, which was filed on January 15, 1997, "was apparently the third complaint Funnyre made to police against Stewart, demonstrating a pattern of biased behavior. As such, it should have been obvious to the government that it had to disclose the PD–251 and PD–252 for use in impeaching the complainant." At best, however, establishing evidence of bias by the complainant against appellant in January 1997 would have added remarkably little to appellant's defense. Mr. Funnyre had already admitted to a reason for such bias against appellant in his testimony— the November 13 shooting. Appellant

therefore has failed to demonstrate with "reasonable probability" that the undisclosed police reports would have undermined Mr. Funnyre's credibility and changed the outcome of his trial.

## V. CONCLUSION

The judgment of conviction and the order denying appellant's motion under D.C.Code § 23–110 are both

*Affirmed.*