Thomas ZANDERS, Appellant,

v.

UNITED STATES, Appellee.

No. 05–CF–246.

District of Columbia Court of Appeals.

Argued Sept. 8, 2008.
Decided July 29, 2010.

M. Elizabeth Kent, Washington, DC, appointed by the court, for appellant.

Suzanne C. Nyland, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III and Amanda Haines, Assistant United States Attorneys, were on the brief for appellee.

Before RUIZ, GLICKMAN, and BLACKBURNE–RIGSBY, Associate Judges.

RUIZ, Associate Judge:

Appellant was convicted of several felony offenses in connection with the stabbing of Allan Lancaster in May 2000, and of the murder of Lancaster and a bystander six weeks later.[1] Appellant challenges the admission of several hearsay statements on Confrontation Clause and evidentiary grounds, and claims that the government suppressed evidence in violation of his constitutional due process rights, warranting a new trial. He also argues that there was insufficient evidence of "serious bodily injury" as required for a conviction of AAWA. Having considered these claims of error and their effect on appellant's trial, we reverse his convictions for assault related to the stabbing and remand the case to the trial court for further proceedings.[2] We affirm appellant's other convictions.

## I. Facts

Appellant, Thomas Zanders (a.k.a. "T.J."), and Allen Lancaster (a.k.a. "Snuff") were residents of the D.C. neighborhood known as Lincoln Heights, where they regularly dealt in drugs. Appellant had been robbed by Lancaster at gunpoint in the past and on May 17, 2000, a fight ensued between them in which Lancaster was stabbed and shots were fired. The bleeding Lancaster started to walk away with his brother Jamar, was taken by a passerby to a nearby fire station, and, from there, by ambulance to a hospital where he was treated for an open wound in the chest cavity. At the fire station, Lancaster was questioned by Metropolitan Police Department (MPD) Officer Kevin Raynor. Lancaster told the officer that he

---

1. For the two deaths, appellant was convicted of conspiracy to commit premeditated first degree murder, in violation of D.C.Code § 22–1805a(a) (2001), two counts of first degree premeditated murder while armed, in violation of D.C.Code §§ 22–2101, –4502 (2001), carrying a pistol without a license (CPWL), in violation of D.C.Code § 22–4504(a) (2001), and possession of a firearm during a crime of violence (PFCV), in violation of D.C.Code § 22–4504(b) (2001). With respect to the earlier stabbing of Lancaster, during which one of the attackers shot at Lancaster, appellant was convicted of assault with a dangerous weapon (ADW) (as a lesser included offense of assault with intent to kill while armed) in violation of D.C.Code § 22–402 (2001), aggravated assault while armed (AAWA), in violation of D.C.Code §§ 22–404.01, –4502 (2001), and PFCV.

2. Because we conclude that appellant's assault convictions related to the stabbing cannot stand, the related conviction for PFCV is also reversed.

had been approached on a basketball court by three acquaintances, one of whom, appellant, had stabbed him, and another had shot at him. Lancaster repeated the accusation at the hospital when he was questioned by MPD Detective George DeSilva. At trial, appellant took the stand and claimed that he had stabbed Lancaster in self-defense. According to appellant, Lancaster had threatened him with a knife as part of a robbery and was stabbed during the struggle when appellant attempted to disarm him.

Six weeks after the stabbing, in the early morning hours of July 1, 2000, four men wearing scarves over their faces came into a courtyard where Lancaster sat in front of 224 51st St., N.E., and unleashed a hail of bullets killing Lancaster and a bystander, Cateria Howell (a.k.a. "TT"). Three witnesses who were present at the shooting testified at trial, one of whom, Monica Brown–Robinson, identified appellant as one of the gunmen.[3]

That appellant was guilty of these murders was corroborated by Ernest Clark (a.k.a. "Moo–Moo"). Clark testified that he was approached by appellant and Frankie Winston (a.k.a. "Dog"), and appellant had told Clark that he had stabbed ("put the knife into") Lancaster. Clark also said that, according to Winston, he, appellant, and two others wore scarves to cover their faces and were the "trigger-men" in the later shooting. They had wanted to "get" Lancaster, but had not intended to injure Howell. Clark recounted that appellant asked him whether he was willing to kill appellant's girlfriend (and mother of his two children), Naseea Tinney, for money, because she was the only one who knew that he had stashed the guns used in the shooting at her house. Winston asked Clark if he was willing to "hit," or kill, the other two "trigger-men," because he trusted only appellant, as he feared that one or both of the others would turn on them.

At trial, appellant denied ever speaking to Clark and claimed that Clark was lying. In rebuttal, the government called Melvin Wider, who had been incarcerated in D.C. jail with appellant while he was awaiting trial. Wider testified that he told appellant that he was "bitter" Clark had "snitched" on Wider by informing the police that Wider was trying to have a child witness killed. Appellant told Wider that he thought Clark was cooperating with the police about him too (appellant had confessed to Clark about stabbing Lancaster) and wanted to impeach Clark's expected testimony to that effect by having Wider testify that Clark had lied when he testified in Wider's trial.[4] Wider testified that

3. Brown–Robinson had known appellant for four years. She was impeached with prior convictions as a heroin user, but she testified that she only had enough drugs to feel "normal" and was not "high" when she witnessed the shooting. Her account also differed from that of the two other eyewitnesses, who testified that the shooters's faces were covered with scarves. The prosecutor tried to reconcile the discrepancy in closing argument by pointing out that Brown–Robinson had seen the men as they approached the courtyard with guns in their hands before they would have covered their faces when they started to shoot, and that she then turned and ran away when she heard the shots.

4. Clark was impeached with his plea agreement. He had been charged with two counts of felony murder while armed in connection with an armed robbery and pled guilty to two counts of accessory to commit murder, conspiracy to commit armed robbery and resisting arrest. He faced a maximum sentence of 30 years (compared to 77 years for the original charges) and was awaiting sentencing at the time he testified in appellant's trial. Clark testified that he was also cooperating with the government in other cases, including against Wider, and planned to testify against his accomplice in connection with the murders to which he pled guilty to lesser charges.

after he met with appellant's trial counsel, he notified the United States Attorney's Office. The prosecutor offered, and Wider accepted, an agreement to plead guilty to offenses "involving drugs, witness tampering and conspiracy to commit murder," for which he faced a maximum sentence of life imprisonment—as opposed to the possibility of capital punishment if convicted after trial as charged. In exchange, Wider agreed to cooperate and testify at appellant's trial. At trial, Wider testified that he had lied to appellant when he told him that Clark had fabricated the story about his arranging to kill the child witness. In fact, Wider pled guilty to that offense.[5]

## II. Confrontation Clause: The Stabbing

A. *Lancaster's Statements to Police Concerning the Stabbing*

Appellant argues that the admission of out-of-court statements made by Allen Lancaster to police officers at the fire station and hospital accusing appellant of having stabbed him violated his rights under the Confrontation Clause. Specifically, he argues that Lancaster's out-of-court statements were testimonial and do not come within the forfeiture-by-wrongdoing exception to the Confrontation Clause, as the government contends on appeal.[6] We agree with appellant's contention.

■■■ "Under the forfeiture-by-wrongdoing doctrine, a defendant forfeits his Sixth Amendment right to be confronted by a witness against him, as well as his objection to the introduction of hearsay, if he wrongfully procured the unavailability of that witness *with the purpose of preventing the witness from testifying.*" *Roberson v. United States*, 961 A.2d 1092, 1095 (D.C.2008) (emphasis added) (citing *Giles v. California*, — U.S. —, 128 S.Ct. 2678, 2684, 171 L.Ed.2d 488 (2008)). "[T]he rule of forfeiture by wrongdoing ... extinguishes confrontation claims on essentially equitable grounds." *Davis v. Washington*, 547 U.S. 813, 833, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (quoting *Crawford*, 541 U.S. at 62, 124 S.Ct. 1354). Because the government presented no evidence that appellant's purpose in murdering Lancaster was to prevent him from testifying about the stabbing, Lancaster's out-of-court testimonial statements were barred by the Confrontation Clause. *See id.* (noting that Federal Rule of Evidence 804(b)(6) and many state courts require a showing of motive by a preponderance of the evidence).[7]

---

5. Wider, who had not yet been sentenced for the crimes to which he pled guilty, was also impeached with felony convictions for which he had served twenty years.

6. The trial court ruled that Lancaster's statements were not testimonial because, in the trial court's opinion, they were not elicited in response to a police investigation. On appeal, the government concedes that Lancaster's statements were given to police officers who were investigating the fight and stabbing, and are therefore testimonial for purposes of the Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36, 52, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *Davis v. Washington*, 547 U.S. 813, 828–29, 126 S.Ct. 2266. The trial court also ruled that, as an evidentiary matter, Lancaster's statements were admissible pursuant to the excited utterances exception to the rule against hearsay. We perceive no merit to the statement in appellant's brief, without argument or supporting authority, that Lancaster's statements to police officers shortly after he was stabbed were not admissible under the hearsay exception for excited utterances. We therefore focus our analysis on the constitutional challenge.

7. The government concedes as much, asserting in its brief that "appellant did not kill Lancaster because Lancaster was a witness to his own stabbing, but because Lancaster had previously robbed appellant (and appellant had failed in his previous attempt to kill Lancaster)."

■ Even so, "certain constitutional errors, no less than other errors, may [be] 'harmless' in terms of their effect on the fact finding process at trial." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Generally, "*Chapman* instruct[s] courts to 'requir[e] the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Fields v. United States,* 952 A.2d 859, 862 (2008) (second alteration original) (emphasis omitted) (quoting *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). The question for a reviewing court "is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). "[I]n other words, [the inquiry] is not whether, in a trial that occurred without the error, a guilty verdict would have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Id.*

■ Applying this demanding standard, we cannot conclude that the erroneous admission of Lancaster's hearsay statements to Officer Raynor and Detective DeSilva concerning the stabbing were harmless beyond a reasonable doubt. According to Officer Raynor, who saw Lancaster at the hospital after he had been stabbed, Lancaster said that appellant and two others (Winston and someone named Harold Dean, sometimes referred to as "Tommy Johnson") had approached him and asked, "what you doing on my basketball court," and that appellant had then stabbed him while one of the others (Dean) had shot at

him. Lancaster's identification of appellant as the person who stabbed him was not as crucial as might appear at first blush, as it was undisputed that appellant stabbed Lancaster: Lancaster's brother, Jamar, who knew appellant, testified that from half a block away, or approximately 21 feet, he watched as appellant got into a fight, or a "tussle" with his brother and swung a knife, about six to eight inches in length, at his brother's left side. Jamar testified that he was "[o]ne hundred percent sure" it was appellant who stabbed his brother. Clark testified that appellant confessed to him that "he had put the knife into [Lancaster.]" And at trial, appellant took the stand and admitted that he stabbed Lancaster.[8]

But even though it was undisputed that appellant had stabbed Lancaster, appellant claimed that he did so in self-defense, and not without provocation as Lancaster's hearsay statement to the officers indicated. According to appellant's version of events, he had been sitting watching a basketball game when Lancaster "walked up with a knife in his hand and said let me get some money off you," and then took appellant's watch, money, and chain. Winston, who had left the basketball court when he saw Lancaster approaching, returned with a gun. According to appellant, he took advantage that Lancaster was momentarily distracted by the return of an armed Winston, and "grabbed the knife" from Lancaster; during their tussle over the knife, appellant testified, he stabbed Lancaster. Appellant had felt "scared" because twice before Lancaster had robbed him and his friends at gunpoint after having ordered them to lie on the ground, and, this time, Lancaster had threatened to kill him if appellant did not give him everything he had. Two witnesses, Brown–Robinson and

---

**8.** Appellant does not argue that his decision to testify, or his trial strategy, was in any way influenced by the erroneous admission of Lancaster's testimony against him.

Wanda Crawford, presented testimony that corroborated appellant's fear of Lancaster. They testified that they had seen Lancaster rob appellant and his associates at gun point on a previous occasion. Brown–Robinson also said that Lancaster was known to rob people and that she had seen him do so "at least three times." Moreover, physical evidence showed that Lancaster was high on PCP on the day he was stabbed on the basketball court.

Lancaster's brother Jamar, however, had a different story. He testified that he saw appellant and Lancaster arguing and heard appellant say: "I told you ... don't ever come around here again." Jamar added that it was appellant who was armed with a knife with a blade 6–8″ long, that Lancaster was not armed, and that after appellant swung the blade at him, Lancaster "elbow[ed]" appellant on the side of his head. At that point, another man—an associate of appellant's—fired two shots. Lancaster then threw a plastic chair at appellant, who ran away with the man who fired the shots as Lancaster balled up his fist and told Jamar "that he was gonna get them." The evidence, in short, was conflicting as to who came armed and initiated the fight at the basketball court.

 It is possible that in a trial without the statements made by Lancaster to the police that appellant stabbed him simply for being on a basketball court over which appellant felt he had a proprietary interest, the jury would have found appellant guilty of assault based on Jamar's testimony that appellant was armed and initiated the fight and the permissible inference that appellant was motivated to retaliate for Lancaster's previous assaults and robbery. But in evaluating the prejudicial impact of inadmissible evidence, we take the evidence as it was presented in the trial that was had, not in a hypothetical error-free trial. *Fields*, 952 A.2d at 862. In light of the conflicting evidence as to who came armed and initiated the fight on the basketball court and the history of Lancaster's prior aggressive acts against appellant and others, we cannot say that the deceased Lancaster's unconfronted statements that appellant stabbed him without provocation did not influence the jury to disbelieve appellant's claim that he acted in self-defense when Lancaster, high on PCP, tried to rob him and threatened to kill him with a knife. Two notes from the jury asked whether ownership of the knife was relevant to the assault charges related to the stabbing. These questions suggest that at least one juror might have thought appellant was not armed. In short, we are not convinced that "the guilty verdict rendered in *this* trial was surely unattributable to the error." *Sullivan*, 508 U.S. at 279, 113 S.Ct. 2078. We therefore reverse the assault convictions as well as the related conviction of PFCV in connection with the stabbing.[9]

9. Appellant also argues that Lancaster's improperly admitted hearsay statements about an unprovoked stabbing were used to implicate appellant in the shootings six weeks later, by providing a motive for murdering Lancaster (and Howell the innocent bystander). According to the prosecutor's closing argument, appellant was "burning to get even with" Lancaster. We conclude that the error in admitting Lancaster's statements about the stabbing are harmless beyond a reasonable doubt with respect to the murder convictions. As we discuss in the next section, there was strong evidence that appellant was one of the shooters: appellant confessed his role in the murders to Clark when he asked Clark to kill appellant's girlfriend because she knew where the murder weapons were hidden. Winston also incriminated himself and appellant with Clark. Moreover, appellant was identified by an eyewitness to the shootings. And although it is true that evidence that he had recently stabbed Lancaster would have shown that appellant tried to get even, appellant himself testified that he was angry after the fight on

## B. Certificate of No Registration to Prove CPWL

In a Rule 28(k) letter dated August 3, 2009, filed after oral argument, appellant's counsel referred the court to *Tabaka v. District of Columbia*, 976 A.2d 173 (D.C.2009), which held that a certificate of no registration (CNR), a document "*create*[*d* ] . . . for the sole purpose of providing evidence against a defendant," is inadmissible in the absence of testimony from the person who performed the search of the records. *Id.* at 175. Appellant argues, and we agree, that the same reasoning applies with equal force to the CNR introduced at appellant's trial to prove that he was not licensed to carry a pistol, a necessary element of CPWL. *See Little v. United States*, 989 A.2d 1096, 1104–05 (D.C.2010) (applying *Tabaka* to CNR used to establish lack of firearms registration and license to carry a pistol). Because this argument was not raised in the trial court, however, our review is for plain error. *See United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). To survive plain error review, appellant must show that there was error, that the error should have been "clear" or "obvious" to the court, and that the error affected his "substantial rights." *Id.* If these three conditions are satisfied, the court may exercise its discretion to notice a forfeited error, but only if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).

*Tabaka* established that admission of the CNR without the testimony of the person who conducted the records search was error, but because *Tabaka* had not been decided at the time of appellant's trial, whether the error will be deemed to have been "obvious" or "clear" for the purposes of plain error review, depends on whether "the law at the time of trial was settled and clearly contrary to the law at the time of appeal. . . ." *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). We conclude that appellant does not qualify for application of *Johnson's* "special rule." As we have commented, once the Supreme Court decided *Crawford* in 2004, Confrontation Clause jurisprudence was "dramatically transformed," (*Michael* ) *Thomas v. United States*, 914 A.2d 1, 5 (D.C.2006), such that it cannot be said that the law was "settled"—at the time of appellant's trial in 2004—that CNRs could be introduced without violating the Confrontation Clause. *Johnson*, 520 U.S. at 468, 117 S.Ct. 1544; *see Little*, 989 A.2d at 1105 (noting that Confrontation Clause jurisprudence was not settled at time of trial in 2005 and thus error in admitting a CNR without live testimony was not clear for purposes of *Johnson* ). Moreover, because appellant does not argue that the Certificate of No Registration introduced at trial was inaccurate and that he was in fact licensed to carry a firearm (a virtual impossibility under the District's law at the time, *see District of Columbia v. Heller*, —— U.S. ——, 128 S.Ct. 2783, 2788, 2821–22, 171 L.Ed.2d 637 (2008)), that element of the offense of CPWL is "essentially uncontroverted," and it cannot be said that the fairness of his judicial proceeding was seriously affected. *See* (*Michael* ) *Thomas*, 914 A.2d at 22–23.[10]

---

the basketball court and that Lancaster had assaulted and robbed him at gun point twice before, providing an equally strong motive for wanting to get even with Lancaster.

**10.** Appellant's brief mentions in passing that the jury did not make the findings required for felony CPWL, that he carried a pistol outside the home. *See* D.C.Code § 22–4504(a) (2001). The jury was properly in-

## III. Hearsay—Statements Against Penal Interest

### A. *Winston's Statements to Clark*

 The trial court admitted hearsay statements made by Frankie Winston to Clark pursuant to the exception to the hearsay rule for statements against penal interest.[11] "The trial court's conclusion that a statement is (or is not) against the declarant's penal interest is 'clearly a legal question' that we review *de novo*." *Bell v. United States*, 950 A.2d 56, 64 (D.C.2008) (quoting *Ingram v. United States*, 885 A.2d 257, 263 (D.C.2005)). This court has held that whether a proffered declaration is admissible as a statement against penal interest requires a three-step inquiry: "(1) whether the declarant, in fact, made a statement; (2) whether the declarant is unavailable; and (3) whether corroborating circumstances clearly indicate the trustworthiness of the statement." *Laumer v. United States*, 409 A.2d 190, 199 (D.C. 1979).

 We focus on the third factor, the trustworthiness of the hearsay statements.[12] First, Clark testified that Winston and appellant spoke to him together on three different occasions about the murders and asked him to kill potential witnesses for money. Appellant asked him to kill Naseea Tinney, because, as appellant explained, she knew that the murder weapons he and Winston had used were hidden in her house; Winston, for his part, asked if Clark would be willing to "hit" the other two "trigger-men" who had participated with Winston and appellant in the shooting. According to Clark's testimony, in other words, the statements made by Winston to Clark incriminated Winston directly (as well as appellant) and were neither "collateral" nor "neutral as to [the declarant's] interest." *(Keith) Thomas v. United States*, 978 A.2d 1211, 1229 (D.C. 2009) (alteration in original) (quoting *Williamson v. United States*, 512 U.S. 594, 600, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994)). The statements did not tend to exculpate Winston at appellant's expense, a concern that the Court has identified in considering the reliability of hearsay statements in which the declarant accepts some blame but shifts greater responsibility to others. *Cf. Williamson*, 512 U.S. at 603, 114 S.Ct. 2431. Second, Clark testified that although he could not remember exactly when the conversations took place, they occurred within several weeks of his having been barred from Lincoln Heights on July 5, 2000, shortly after the murders. *Cf. United States v. Guillette*, 547 F.2d 743, 754 (2d Cir.1976) (finding that declarant's inculpatory statement made four

structed on this charge, however, and the evidence supports the jury's finding that appellant carried a pistol when he shot Lancaster outdoors. The jury was not asked to make a special finding on this point.

**11.** At oral argument, counsel for appellant conceded that the introduction of Winston's hearsay statements did not implicate the Confrontation Clause because they were not testimonial. *See Crawford*, 541 U.S. at 52, 124 S.Ct. 1354.

**12.** As concerns the first factor, whether Winston made the statements related by Clark, appellant's sole claim seems to be that because Clark collaborated with the government and had "snitched" on Wider, he therefore was not to be trusted. Appellant cites no authority for the proposition that a witness's collaboration with the government or "snitching" makes the witness incompetent to testify. Indeed, such a blanket rule would doom many a government witness. The facts that appellant points to go to the witness's motivation and possible bias and were fully exposed to the jurors who had the ultimate decision whether to believe Clark or not. See *supra* note 4. The second step of the *Laumer* inquiry, unavailability of the witness, is also satisfied given that Winston was dead at the time of appellant's trial.

months after the crime was too attenuated and remote to provide assurance of reliability). Third, as the trial court noted, the statements were made by Winston to a "close friend or associate," which "indicates that the declarant was aware of his potential criminal liability and therefore revealed the statement only to those persons whom he thought he could trust." *Laumer,* 409 A.2d at 201.[13] Finally, there was evidence corroborating Winston's statements to Clark about his and appellant's involvement in the murders: appellant's own statements to Clark incriminated both men[14]; Winston was identified by two witnesses who saw him approach the scene of the murders with a gun just before the shooting began; Clark testified that Winston and appellant did everything together; and appellant, along with Winston, was identified by Brown–Robinson, an eyewitness who had known them for several years, as two of the shooters. Furthermore, through the testimony of several witnesses, the government presented evidence that appellant tried to evade the police once he discovered they were investigating the shooting. In sum, because the evidence as a whole suffices to establish that Winston's self-incriminatory statements to Clark (that also incriminated appellant) were reliable, we conclude that

they were properly admitted under the hearsay exception for statements against penal interest.[15]

### B. *Winston's Statements to Godfrey*

▇▇ Defense counsel also objected to the admission of out-of-court statements made by Winston to Lakisha Godfrey, who testified that she spoke to Winston the day after the murders. According to Godfrey, Winston was "sad" and told her that "it wasn't meant for TT," that it was "messed up . . . to bring some females into it."[16] At trial, defense counsel argued that these statements were not relevant, but appellant argues for the first time on appeal that they were improperly admitted as statements against Winston's penal interest. We therefore review the trial court's decision to admit Godfrey's testimony concerning Winston's hearsay statements for plain error. *See* (*Thomas*) *Harris v. United States,* 602 A.2d 154, 159 (D.C. 1992). Even assuming their admission was erroneous, appellant cannot show that he was prejudiced, and therefore cannot meet the third prong of plain error review, whether the error affected appellant's "substantial rights." *United States v. Dominguez Benitez,* 542 U.S. 74, 82, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004). Any

---

13. Clark, who had been released from prison several months earlier after having been incarcerated for eleven and a half years, testified that he had known appellant and Winston from the Potomac Gardens neighborhood. According to Clark, who is older than appellant, he had watched over appellant and given him money before Clark was incarcerated. When Clark was released from prison and returned to Potomac Gardens, he looked for appellant, the only acquaintance remaining in the neighborhood and a person he thought of as his best friend. Appellant and Winston had given Clark money and—the jury could infer—proposed that Clark "hit" the inconvenient witnesses because they knew that he needed the money.

14. Appellant does not challenge the admission of his own statements to Clark.

15. We therefore need not decide whether Winston's statements, which were made in appellant's presence, were also admissible as appellant's adoptive admissions, *see* (*Michael*) *Harris v. United States,* 834 A.2d 106, 116 (D.C.2003), or attributable to appellant as co-conspirator statements. *See Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

16. Godfrey was a reluctant witness at trial and was impeached with her testimony before the grand jury.

link between Winston's statement to Godfrey and a verdict against appellant for the murders required that the jury conclude not only that Winston was referring to himself as one of the shooters, but also inferentially incriminating appellant as his partner. However, Godfrey denied that Winston had implicated himself in the shootings, and she never said that Winston had mentioned appellant at all. Moreover, other evidence was much more incriminating, including the properly admitted statements made by Winston to Clark, and appellant's own statements to Clark, which implicated both Winston and appellant in the murders, as well as the eyewitness identification made by Brown–Robinson. Finally, the government moved away from the subject on direct examination, and Winston's statement to Godfrey was not referred to again by the government, or anyone, until this appeal. Therefore, appellant has not met his burden of showing a "reasonable probability" that, but for the admission of Winston's statement to Godfrey, he would have been found not guilty. *Id.* at 81–82, 124 S.Ct. 2333.

### IV. Due Process Claims: *Brady* and *Giglio* Violations

 Finally, appellant argues that he is entitled to a new trial because the government suppressed evidence in violation of his constitutional due process rights. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Not every suppression requires reversal, however. "There are three components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *see also Giglio v. United States,* 405 U.S. 150, 153–54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

Specifically, appellant argues that the government did not disclose, until two weeks before the scheduled trial date (the trial actually started a week later) in September 2004, evidence of a reported altercation between Lancaster and someone named "Shawn" that occurred the night before the shooting at the same place where Lancaster was shot.[17] This con-

---

17. The discovery process in this case was contentious. According to the record, defense counsel sent two discovery requests to the government on December 31, 2003, a *Rosser* letter and a "Request for Specific *Kyles* and *Brady* information." The latter, in addition to asking for certain specific information, requested "any other matters known to the government that may be exculpatory or otherwise favorable to the defendant," citing *Brady.* On January 23 and 24, the government turned over certain information and documents as a matter of course: PD 81, 163, and 251, complaint, affidavit in support of arrest warrant, crime scene examination reports, death reports, and autopsies. After counsel moved to compel discovery on March 26, 2004, the government answered that the prosecutor assigned to the case had not received counsel's discovery requests until March 5, and the court ordered the government to respond on March 25. On March 25, 2004, the prosecutor sent a letter to defense counsel in response to the *Rosser* letter and on March 29, filed a response to the "Request for Specific *Kyles* and *Brady* information" with the court in which the government essentially refused the discovery request as "boilerplate," "wholesale discovery of the government's case" or, in the case of *Giglio* material, not required by law to be turned over until trial. These documents show trial date of June 14, 2004, which was later postponed at the government's request due to the

frontation, appellant argued, could have provided Shawn with a motive for shooting Lancaster the following day, laying the foundation for a *Winfield* defense. *See Winfield v. United States*, 676 A.2d 1, 4 (D.C.1996) (en banc). Defense counsel moved to dismiss the case, claiming that the information had been disclosed too late to permit adequate investigation and preparation for trial. The motions court denied that request but left open the possibility that counsel could ask for a continuance or renew the request for dismissal "at a later point," once the record was better developed. Instead, the court required that the prosecutor provide the police reports to the defense and make available the investigating detective, Detective Jeffery Smith, to assist counsel in locating the witness. Defense counsel was advised that the witness might be found through her sister. Defense counsel did not request a continuance or renew the motion to dismiss during trial. Counsel did, however, file a motion for a new trial after the verdict, renewing the claim that the government had breached its *Brady* obligations. The trial court denied the request for a new trial, finding that defense counsel had eventually been able to interview the witness who recanted the potentially exculpatory statement she had given the police.

We have said that where the trial court has determined that there is no *Brady* violation, as is the case here, "independent review is precluded" and the trial court's decision should be affirmed if it was "reasonable." *Stewart v. United States*, 881 A.2d 1100, 1117 (D.C.2005) (quoting *Davies v. United States*, 476 A.2d 658, 661 (D.C. 1984)). But we also have recognized that in determining whether there has been a *Brady* violation "independent or *de novo* review" of the withheld evidence in the context of the evidence at trial might be required under the standards applied by the Supreme Court in reviewing *Brady* rulings. *See id.* (citing *Farley v. United States*, 767 A.2d 225, 228–29 (D.C.2001); *Farley*, 767 A.2d at 233 (Ruiz, J., dissenting) (noting that *de novo* review is "consistent with the origin of the *Brady* materiality test, which is derived from the prejudice prong for ineffective assistance of counsel—an inquiry which the Court has held presents a mixed question of law and fact")). Since *Farley*, we have avoided applying the lesser "reasonableness" standard, where we have been able to conclude instead that even under *de novo* review, no material violation occurred. *See, e.g., Stewart*, 881 A.2d 1100; *Powell v. United States*, 880 A.2d 248 (D.C.2005); *Benton v. United States*, 815 A.2d 371 (D.C.2003). We do so here, and conclude that no material *Brady* violation warrants reversal.[18]

unavailability of a government witness. On April 12, defense counsel filed an addendum to the motion to compel, and on May 17 defense counsel made further requests for certain physical evidence, tests, and statements as well as a general request for *Brady* information. On June 1, 2004, the government responded to the motion to compel, arguing that it had provided discovery to defense counsel on five different occasions from December 2003 to May 2004. In responding to counsel, the government represented that it was "aware of its continuing obligations under *Brady*," but had "no *Brady* disclosures at this time," and in its March 29 filing with the

court, the government stated that it was "fully aware of its obligation to disclose all such exculpatory material ... [and] has complied with that obligation and fully intends to continue complying should any exculpatory material regarding defendant Zanders come into its possession." As noted in the text, information about the potential *Winfield* witness was not disclosed until two weeks before the rescheduled September trial date.

18. Appellant's *Brady* claims were considered twice, by the motions judge before trial and by the trial judge in a post-trial hearing on appellant's motion for new trial.

We begin by noting that defense counsel was undoubtedly placed in a difficult position by the receipt of potentially significant exculpatory information so close to trial, especially as counsel had difficulty locating the witness, Stephanie Lewis. There is no apparent reason for the late disclosure, as the two WACIIS police reports on the matter were prepared on July 1, and July 7, 2000, more than four years before the trial, and the trial prosecutor had interviewed the witness in 2003. When the prosecutor did disclose the information (but not the actual police reports) to the defense shortly before trial, she explained to defense counsel that the disclosure was out of an "excess of caution" and not because it was exculpatory, as the police thought the witness's statement about the fight between Lancaster and Shawn was unfounded based on subsequent interviews with the witness.[19]

On appeal, the government argues that it was not obligated to disclose investigative leads that proved fruitless, citing *United States v. Sedgwick,* 345 A.2d 465, 474 (D.C.1975). But even though the government is not required to provide a "complete and detailed accounting to the defense of all police investigatory work on a case," *Moore v. Illinois,* 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), a witness's statement about a confrontation between the victim and a third party so close in time and place to the murder pointed to a possible other perpetrator and was not merely "a street rumor which remained unverified despite an immediate effort by the investigating officer to ascertain whether there was such an individual...." *Sedgwick,* 345 A.2d at 473. Here, the witness did not recant her initial report to the detective when she was interviewed the second time; rather, she said she was "scared" and did not "want" to talk to the police. See *supra* note 19. And by the time that the prosecutor interviewed her, the witness claimed to have forgotten the entire incident. That progression could be interpreted to mean, as the police concluded, that the witness's report of a confrontation between Lancaster and Shawn was unfounded, but it also could have been further investigated and presented by defense counsel in an attempt to persuade the jury that it should have a doubt about whether appellant was one of the masked shooters.

▆▆▆▆ It should by now be clear that in making judgments about whether to

---

**19.** In the report dated July 1, 2000, the day after the murders, Detective Smith noted that he had "ascertain[ed] from several witnesses" that Lancaster had gotten into a fight with "Shawn" two days earlier over drug turf. On July 7, Detective Smith reported that "the witness [not "several" witnesses, as previously mentioned] that provided this information" was "very reluctant" and "scared," and "no longer wanted to speak to" the detective. Two other persons, however, including Lancaster's sister, told the detective that Lancaster had not been in the area the night before the shooting. The July 7 report also states that "initially" there had been information that "Shawn had come through the area and stated to the residents to take their kids in the house"—an indication that he expected violence to erupt. Because he had been unable to corroborate that Shawn had been in the area, however, Detective Smith concluded that "there [was] no evidence or no one else to suggest that Shawn [had] anything to do with this homicide at [that] time."

In opposing appellant's post-verdict motion for a new trial, the prosecutor represented that she had interviewed Lewis in July 2003 and that "with her attorney present, Lewis claimed that she could not remember anything about the year 2000 because of her drug abuse problems." The prosecutor's 2003 interview of Lewis had not been disclosed to defense counsel before trial and appears to have come to light in court when Detective Smith testified at the hearing on appellant's pretrial motion to dismiss claiming *Brady* violations. *Cf. Moore,* 408 U.S. at 795, 92 S.Ct. 2562 (noting that "the prosecutor at the trial submitted his entire file to the defense").

disclose potentially exculpatory information, the guiding principle must be that the critical task of evaluating the usefulness and exculpatory value of the information is a matter primarily for defense counsel, who has a different perspective and interest than the police or prosecutor. *See Pérez v. United States*, 968 A.2d 39, 66 (D.C.2009) (noting that *Brady* disclosures are "for the purpose of allowing defense counsel an opportunity to investigate the facts of the case and, with the help of the defendant, craft an appropriate defense"). It is not for the prosecutor to decide not to disclose information that is on its face exculpatory based on an assessment of how that evidence might be explained away or discredited at trial, or ultimately rejected by the fact finder. Moreover, the disclosure must be timely if the defense is to have a fair opportunity to pursue leads before they turn cold or potential witnesses become disinclined to cooperate with the defense. *See Lindsey v. United States*, 911 A.2d 824, 839 (D.C.2006) (disclosure must be made "at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case" (quoting *Curry v. United States*, 658 A.2d 193, 197 (D.C. 1995))). Any doubts should be resolved in favor of full disclosure made well before the scheduled trial date, unless there is good reason to do otherwise (such as substantiated grounds to fear witness intimidation or risk to the safety of witnesses), upon request by the defense.

 ▉ Notwithstanding the incomplete and late disclosures in this case, we must conclude that reversal is not warranted because appellant has not met his burden of demonstrating that there was "a rea-sonable probability that, had the evidence been disclosed [earlier], the result of the proceeding would have been different." *Farley*, 767 A.2d at 228. First, although defense counsel advised the trial court that efforts to locate the newly-disclosed witness were still ongoing, counsel did not seek a continuance of the scheduled trial date to further investigate the alleged altercation with Shawn the night before the shooting, nor did counsel raise the issue again during trial, even though the judge had expressed a willingness to consider both. *See Frezzell v. United States*, 380 A.2d 1382, 1385 (D.C.1977) ("[O]nce the report of [a potentially exculpatory witness's] description was turned over to the defense, it was then incumbent upon counsel to request a continuance to make use of the information."); *Williams v. United States*, 881 A.2d 557, 563 (D.C.2005) ("The relative unimportance of these witnesses ... is reflected in the actions of defense counsel, who never requested a continuance in order to investigate their potentially exculpatory testimony...."). Moreover, at the hearing on appellant's post-verdict motion for a new trial, the trial court found that defense counsel did have an opportunity to interview the witness at some (unidentified) date, that the witness had "completely recanted" what she had told Detective Smith when he first interviewed her in July 2000, and that there was "scant information ... never corroborated [and] ... even to this date the so called Shawn remains unidentified."[20] Even though we cannot completely discount the *possibility* that with early and full disclosure, defense counsel might have been better equipped to develop a *Winfield* defense to the murder charges,

---

**20.** In addition to the evidence that was presented at the post-trial hearing, it is evident from the transcript of the hearing that at least the judge also had a transcript of Lewis's testimony before the grand jury in 2003. That transcript is not part of the record on appeal.

in light of the trial court's findings in the post-trial hearing and defense counsel's own actions once the information was disclosed, we perceive no "reasonable *probability*" that counsel could have successfully countered the strong evidence of appellant's guilt presented at trial: Brown–Robinson's identification of appellant as one of the shooters, appellant's and Winston's highly incriminating statements to Clark, appellant's motive to retaliate against Lancaster's repeated armed robberies of appellant and his friends, and appellant's evasion of police detectives investigating the double homicide. The exculpatory evidence, in other words, was not "material," and reversal is therefore unwarranted. *Brady,* 373 U.S. at 87, 83 S.Ct. 1194.

 We can summarily reject appellant's claim that evidence of Clark's and Wider's history as government cooperators was suppressed by the government in contravention of the Court's holding in *Giglio,* requiring the government to disclose any evidence that tends to impeach the character or testimony of a government witness. 405 U.S. at 154–55, 92 S.Ct. 763. Here, also, defense counsel did not seek a continuance to conduct further investigation upon the government's mid-trial disclosure of impeaching evidence with respect to these witnesses. Moreover, there was already a significant amount of impeachment evidence for Clark and Wider, including their extensive criminal histories and plea agreements involving several felony offenses, which, in the case of Wider, included attempting to murder a child witness.[21] The jury was also informed that Clark was

still awaiting sentencing, where he hoped that the government would speak on his behalf after he had testified at appellant's trial. This impeaching evidence was used by defense counsel in cross-examining Clark and Wider. On this record, it cannot be said that if additional evidence that Clark and Wider had previously cooperated with the government on other cases, had been presented to the jury there is a reasonable probability that it would have made a difference to the verdict.[22] We therefore conclude that appellant has not shown that there were *Brady* and *Giglio* violations warranting reversal.

\* \* \*

For the foregoing reasons, we reverse appellant's convictions in connection with the stabbing (AAWA, ADW, and PFCV) and affirm appellant's remaining convictions related to the shootings that left two people dead. See *supra* note 1. We remand the case so that the trial court may vacate the reversed convictions and either retry or resentence appellant in accordance with this opinion.

*Affirmed in part, and reversed and remanded in part.*

---

**21.** Defense counsel complained that the government had not produced the transcript of Wider's plea. We note, however, that Wider had been listed as a *defense* witness, and was not called by the government until its rebuttal case, after appellant took the stand and said

that he had asked Wider to testify for the defense to discredit Clark as a liar.

**22.** Appellant does not explain how the evidence would have added qualitatively different information about Clark's and Wider's reliability.